[No. 42681-1-II.   Division Two.   December 7, 2012.]

*In the Matter of the Welfare of* R.S.G.

*Manek R. Mistry* and *Jodi R. Backlund* (of *Backlund & Mistry*), for appellant.

*Robert M. McKenna, Attorney General,* and *Karen M. Dinan, Assistant,* for respondent.

¶1 VAN DEREN, J. — Christine Aker appeals the trial court's orders (1) setting aside her nonparental custody decree as to her granddaughter, RSG;[1] (2) finding that RSG was a dependent child as to her mother, Jennifer Ware; and (3) placing RSG in foster care. Aker argues that the trial court applied the incorrect standard in setting aside the nonparental custody decree and that the evidence was insufficient to support that decision as well as the dependency finding and the foster care placement. We hold that the trial court erred in vacating Aker's noncustodial custody decree, that Jennifer Ware's dependency is not before us, and that the trial court made no determination that RSG was a dependent child as to Aker. We reverse and vacate the order setting aside Aker's nonparental custody decree and order that her custody rights be restored. We also remand for further proceedings that (1) are to occur within 45 days of issuance of this interlocutory decision under RAP 12.2, (2) acknowledge and respect Aker's nonparental custody rights, and (3) reevaluate the need for RSG's foster care placement with Aker as her custodian.

¶2 Following hearing on this remand to the trial court, the parties shall supplement the record on appeal with the trial court's order(s) within 15 days of issuance of the order(s). This is not an opinion terminating our review. No mandate will issue until 30 days following our final opinion, which will be filed in a timely manner after receipt of the trial court order(s) in accord with our remand decision. RAP 12.5(b).

---

[1] We identify the minor child by her initials to protect the child's identity.

## FACTS

¶3 RSG was born on December 12, 2008. By the time she was three years old, RSG had lived most of her life in Aker's home. RSG's mother, Jennifer, is Aker's daughter, as are Jennifer's younger sisters, Jessica and Justine.[2] RSG's father was deported to Mexico after assaulting Jennifer when she was pregnant with RSG.

¶4 In September 2009, the Washington State Department of Social and Health Services (DSHS) received a referral alleging that Jennifer was at the hospital exhibiting mental health issues and that she had thoughts of harming RSG. The family agreed to a safety plan where RSG would reside with her grandfather and Jennifer would be referred for voluntary services. Jennifer did not want RSG placed with Aker because of Aker's marijuana use, and she did not want RSG placed with Jessica because of Jessica's Child Protective Services (CPS) history with her own children.

¶5 In November 2009, DSHS social worker Dan Escober went to meet Jennifer at Aker's house and found RSG there. In violation of the safety plan, RSG was no longer living with her grandfather because of conflict with his girl friend. Aker asked that RSG remain with her. Because there were no founded allegations of abuse and neglect against Aker, Escober developed a second safety plan for RSG to reside in Aker's home with Jennifer and Justine. At the time of that plan, Aker denied any alcohol or marijuana use. Conditions of the safety plan included: (1) DSHS would approve all supervisors for RSG; (2) RSG would not be exposed to individuals who posed risk, including those under the influence of drugs and alcohol; (3) RSG would not be provided primary care or transported in a motor vehicle by anyone under the influence of drugs or alcohol; and (4) RSG

---

[2] For purposes of clarity, we refer to Jennifer Ware and her sisters by their first names. We intend no disrespect.

would not be exposed to substance abuse. In addition, Jennifer was not to have unsupervised contact with RSG until she could demonstrate that RSG would not be at risk in her care.

¶6 When Escober went to Aker's home in December 2009 to have the safety plan signed, he discovered that Jennifer and RSG were residing with RSG's grandfather. The grandfather agreed to take RSG back but then changed his mind again and turned RSG over to Jennifer. Escober considered filing a dependency petition based on the family's lack of cooperation in following the second safety plan, but Aker filed for nonparental custody because she did not want RSG to go into foster care. Jennifer joined her mother's custody petition. DSHS supported Aker's petition even though it was aware of the dependency established for Jessica in 2006 that had placed both Jessica and her daughter in foster care. During the 2006 dependency proceedings, DSHS refused Aker's request to place Jessica's daughter with her because Aker had tested positive for marijuana and had other parental deficiencies. Also in 2006, Aker had declined a chemical dependency evaluation because of her work schedule. This dependency was dismissed in 2007 when Jessica turned 18.

¶7 After Aker requested nonparental custody of RSG in 2009, Escober took Aker the necessary paperwork. He observed a greater bond between RSG and Aker than between RSG and Jennifer, and he had no concerns about RSG's safety in Aker's home. Escober did not review Aker's completed paperwork before the hearing on her custody petition. DSHS was not a party to the nonparental custody proceedings, and Aker represented herself.

¶8 The nonparental custody decree was granted on March 2, 2010, and DSHS closed its file. The resulting nonparental custody decree appointed Aker as RSG's custodian, and the trial court's findings of fact stated that it was in RSG's best interests to reside with Aker because of her parent's mental health issues. The decree allowed

Jennifer to have limited visitation with RSG, but it did not specify that Jennifer's visitation was to be supervised. In fact, the trial court checked a notation stating that limitations on visitation did not apply.

¶9 In January 2011, DSHS received a referral after the police found RSG outside Aker's house at 10:30 AM. RSG was alone and was wearing a T-shirt, a diaper, and tennis shoes. The investigation revealed that Aker had gone to work and left RSG in the care of Jennifer and Jessica. The youngest aunt, Justine, had left for school earlier, and Jennifer and Jessica were still asleep. Aker installed higher locks on the doors, and DSHS took no further action.

¶10 In April 2011, DSHS received two more referrals. One alleged that Aker had used marijuana with Justine and that Aker was allowing Jennifer to have unsupervised contact with RSG. The second alleged that Jessica had allowed Jennifer to move in with her and that Jennifer was not on medication for her mental health issues. When a social worker went to Jessica's home, she found that Jennifer and RSG were living there in an enclosed porch. Jessica alleged that Aker had verbally abused RSG and that Jennifer and RSG lived with her 90 percent of the time; Jennifer and Aker refuted those allegations. On April 21, 2011, an officer and a social worker went to Aker's house, and Aker admitted using marijuana as a stress reducer and to help her sleep. Aker then retrieved marijuana from the top of her nightstand, which was a location accessible to RSG. The social worker determined that it was not safe for RSG to remain in Aker's home, and it was agreed that she would remain at Jessica's home until a family meeting could be held.

¶11 The social worker then interviewed 16-year-old Justine, who said that Aker would give her money to buy marijuana and that they both used marijuana. The social worker also spoke with Jennifer, who was upset by the conflict between Aker and Jessica and preferred foster care for RSG over her placement with either relative. Jessica

contacted the social worker and said she no longer wanted to care for RSG.

¶12 DSHS filed a dependency petition on April 27 and placed RSG in shelter care the same day. In its amended dependency petition, DSHS cited Jennifer's mental health issues and refusal to participate in parental services, as well as Aker's substance abuse, her history of CPS involvement, and her actions in permitting RSG to be around unsafe people.[3] At a shelter care hearing, Aker testified that she sometimes used marijuana after getting off work and before picking RSG up at Jessica's house, where the child stayed while Aker worked.

¶13 DSHS then moved to intervene in the nonparental custody case and to consolidate it with the dependency case. After the court granted both motions, DSHS moved to set aside the nonparental custody decree.[4] Aker sought an order requiring DSHS to pay for her drug treatment, arguing that as RSG's nonparental custodian she was a party to the dependency and eligible to receive services to correct parental deficiencies. Aker explained that although she had paid for a chemical dependency evaluation soon after RSG's removal from her home, she lacked funds to pay for treatment. The trial court denied her motion as premature, adding that it could be renewed following the fact finding/custody decree hearing if appropriate.

¶14 The motion to set aside the nonparental custody decree and the dependency fact-finding were heard together on September 13, 2011. Nine witnesses testified to the facts cited above.

¶15 DSHS's concerns about Aker included her family's conflict, her marijuana use and the drug's accessibility, and her verbal abuse of RSG. One of the social workers de-

---

[3] The initial dependency petition sought to vacate the nonparental custody decree; the amended petition made no such request.

[4] DSHS's motion to set aside the nonparental custody decree cited no law, court rule, or statute.

scribed the relationship between Aker, Jennifer, and Jessica as always very conflicted, "sometimes Jennifer lives with . . . Aker, and sometimes Jessica lives with . . . Aker, sometimes Jessica and Jennifer live together." Report of Proceedings (RP) (morning session) at 23.

¶16 Jennifer testified that the moving around and much of the chaos had ceased when Aker received custody of RSG and that Aker had lived in her current home for a couple of years. She also testified that she never had unsupervised access to RSG; one or both sisters were also present while Aker was at work. Jennifer wanted DSHS to place RSG with her or with Aker.

¶17 Aker testified that she had resumed using marijuana at the end of 2010 for medical reasons, and she produced a valid medical marijuana card. She denied Jessica's allegations of verbal abuse of RSG and said she did not think her marijuana use affected her driving. She also said she would be willing to undergo treatment or any other service requested but could not afford to pay for services. (DSHS had provided mental health services to Jennifer for her bipolar disorder but had refused to provide marijuana treatment to Aker because it was recommending Jennifer as RSG's parent.)

¶18 During closing argument, DSHS asked the court to set aside the nonparental custody decree and to find a dependency as to Jennifer so it could provide her services and determine whether RSG would be safe in her care. Aker asked the court to consider a third option by entering the dependency but retaining the nonparental custody decree and requiring DSHS to provide her with treatment. Jennifer wanted the court to return RSG to her care and to keep the nonparental custody decree open as an alternative. The trial court ruled as follows:

> The motion to set aside the nonparental custody decree needs to be examined in terms of what is in the best interests of the child. That is the appropriate test.

In the initial determination of whether a child should be placed into nonparental custody, the Court needs to make a threshold determination regarding fitness of the parent, but we're not in that situation.

[Aker's attorney] argued at the outset of this case today that the Court needed to determine if . . . Aker was a fit custodian, and that's not the test. It's whether or not it is in the best interests of [RSG] to be placed with . . . Aker.

And I do not believe that is in her best interest, and there's no question in my mind that this decree would not have been signed, would not have been granted, back in April or whatever month it was of 2010, had the judge at that time been provided with the recent history of this case and of these people[.]

For example, the fact that . . . Aker had been involved in a dependency action involving . . . Jessica and had refused to engage in the services that were recommended and offered at that time and simply allowed her daughter to remain in foster care until she aged out.

That's a pretty important fact if I'm the judge being presented with a petition by someone seeking nonparental custody of an infant.

I think it would have been helpful for the judge back in 2010 to know that this family of . . . Aker and her daughters was completely dysfunctional. It was dysfunctional then, and it is dysfunctional now.

I think it would have been helpful to the judge at that time to know that there ha[ve] been two different voluntary safety plans which were not followed.

I think it would have been helpful to the judge at that time to know that there had been involvement, recent involvement, by [DSHS] involving this child.

And I'm not placing fault for the lack of information provided to the judge in the nonparental custody action at the feet of [DSHS]. I'm just saying that had the judge known these things,

that decree would not have been entered. There's no question in my mind about that.[5]

Even if the judge may have determined and concluded that Jennifer . . . was an unfit parent, the judge would not have found . . . Aker was an appropriate placement. The judge would not have found that it was in the best interests of [RSG] to be placed with . . . Aker. Some other action would have been taken. The judge probably would have on his own initiative involved [DSHS] into that case once again.

So I'm going to set aside the decree of nonparental custody.

RP (afternoon session) at 62-64. The trial court's written order stated that based on the oral findings, the nonparental custody decree was both set aside and dismissed.

¶19 The trial court then found a dependency as to Jennifer, as she was not able to adequately care for her daughter due to significant mental health issues. Based on an additional finding that RSG had been abused or neglected and that she had no parent or custodian capable of providing adequate care, the court ordered her to continue in foster care, pending the outcome of the dependency dispositional proceedings and Jennifer's service plan.

¶20 Citing CR 59, Aker moved for reconsideration and submitted documentation either provided to or signed by the court that initially granted her nonparental custody petition. More specifically, she included an order from the nonparental custody file directing DSHS to release certain information to the court concerning Aker's history with DSHS and CPS. She also noted that the judge who signed the nonparental custody decree was the same judge who had signed numerous orders pertaining to Aker's DSHS/CPS history. Finally, Aker argued that the only justification for setting aside the nonparental custody decree more than

---

[5] Neither CR 60 nor chapter 26.09 RCW suggest that a second judge's opinion about what the original judge would have done is a proper ground for vacating nonparental custody rights.

one year after entry was in CR 60(b)(11) and that DSHS had not met that standard.

¶21 The trial court denied the motion for reconsideration in a letter ruling, stating that it had treated the State's request to set aside the custody decree as a motion to modify a custody order under RCW 26.10.190. Adding that the standards of RCW 26.09.260 governed, the court stated that it had found "that the custody of the child with ... Aker was detrimental to the child's physical, mental and emotional health, and that any harm which might result from a change of environment was outweighed by the advantage of a change." Clerk's Papers (CP) at 181.

¶22 Aker now appeals the order setting aside the nonparental custody decree, the dependency order, and the order placing RSG in foster care.

## ANALYSIS

I. Vacating the Nonparental Custody Decree

¶23 Aker argues that the trial court erred in granting DSHS's motion to set aside the nonparental custody decree and that it did not apply the appropriate procedures and standards for modifying a nonparental custody decree. DSHS responds that Aker failed to preserve her argument about the legal basis of the trial court's order vacating her nonparental custody decree. DSHS further asserts that it had no obligation to follow the modification procedures and standards in RCW 26.09.260 and .270 because it had already taken physical custody of RSG, and Aker's legal custody could therefore be set aside based on RSG's best interests. As support, it cites a decision holding that the presumption that a child's placement with a fit parent is in the child's best interests governs a custody determination in the first instance. *In re Custody of Shields*, 157 Wn.2d 126, 146, 136 P.3d 117 (2006).

A. Standard of Review

■ ¶24 We review a trial court's order vacating a validly entered prior court order under CR 60 for abuse of discretion. *Haller v. Wallis*, 89 Wn.2d 539, 543, 573 P.2d 1302 (1978). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *Jenbere v. Lassek*, 169 Wn. App. 318, 321, 279 P.3d 969, *review denied*, 175 Wn.2d 1028, 291 P.3d 254 (2012).

■ ¶25 In reviewing a custody modification, the proper standard of review is whether the trial court's findings are supported by substantial evidence and whether the court has made an error of law that may be corrected on appeal. *In re Marriage of Taddeo-Smith*, 127 Wn. App. 400, 405, 110 P.3d 1192 (2005).

■ ¶26 When we are unable to determine the basis of the trial court's ruling vacating a custody decree, as in this case, we vacate the order and remand for further proceedings, directing the trial court to adhere to the proper procedures, depending on the basis of the motion to vacate. While the procedures followed in this case may be unusual, we take this opportunity to make clear the standards and procedures to be employed when dealing with a custody decree in the dependency context.

B. Vacation of Decree/Nonparental Custody Decree Modification

1. CR 60 Motion To Vacate

■ ¶27 CR 60(b) governs motions to vacate court orders and decrees. Any judgment may be vacated under CR 60(b). 4 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 60 author's cmts. at 546 (2006) (citing *Ebsary v. Pioneer Human Servs.*, 59 Wn. App. 218, 225, 796 P.2d 769 (1990)). Because DSHS sought to vacate the nonparental custody decree more than one year after entry, the only subsection that appears applicable to its motion is CR

60(b)(11), which is a catchall provision authorizing judgments to be vacated for any other reason justifying relief. Use of this provision is limited to situations involving extraordinary circumstances. *In re Marriage of Flannagan*, 42 Wn. App. 214, 221, 709 P.2d 1247 (1985).

¶28 Here, DSHS filed a motion to vacate Aker's nonparental custody decree without identifying the basis of its motion or even citing authority. But, as DSHS states in its appellate brief, it did not move to modify the nonparental custody decree; thus, it appears it might have been proceeding under CR 60. DSHS initially stated that it moved to set aside Aker's custody decree based on its belief that RSG needed to be adopted and that adoption was not possible until the nonparental custody decree was set aside; it believed this action was in the child's best interests. But during the fact-finding hearing, DSHS asserted that returning RSG to her mother was a viable option.

■ ¶29 In the memorandum of authorities filed at trial, DSHS cited RCW 13.34.155(2)(a) as authority for the best interests standard. Aker responded that RCW 13.34-.155(2)(a) addresses the establishment or modification of a parenting plan during a dependency proceeding and is irrelevant to nonparental custody actions, which are governed instead by chapter 26.10 RCW. In her opening argument during the fact-finding hearing, she again explained that the best interests standard and RCW 13.34.155 did not govern the proceeding and that changes in custody were to be discouraged. Thus, contrary to DSHS's argument on appeal, Aker preserved her claim of error regarding the legal basis for the trial court's order.

¶30 During closing argument, DSHS argued for the first time, and without further explanation, that the trial court had to look at whether there was "a change in circumstances, or is there a detriment to the child," which was apparently a reference to the modification standards in chapter 26.09 RCW. RP (afternoon session) at 52.

¶31 Neither the trial court's oral ruling nor its later written order denying reconsideration properly articulated the applicable standards under either CR 60 or chapter 26.09 RCW. The trial court initially stated that its rulings were in RSG's best interests and that it was certain that the judge who granted Aker custody would not have done so if fully informed. On reconsideration, the court referred to the modification standards in RCW 26.09.260 but did not apply them properly, as the following discussion reveals.

2. Motion To Modify—Chapter 26.09 RCW

¶32 Chapter 26.10 RCW governs nonparental custody proceedings, and a nonparental custody order may be modified only under chapter 26.09 RCW. *In re Custody of Nunn*, 103 Wn. App. 871, 882, 14 P.3d 175 (2000), *abrogated on other grounds by Shields*, 157 Wn.2d 126; RCW 26.10-.190(1). Compliance with RCW 26.09.260 is mandatory, and the trial court's failure to make findings that reflect the application of each relevant factor is error. *In re Marriage of Tomsovic*, 118 Wn. App. 96, 103, 74 P.3d 692 (2003); *In re Marriage of Shryock*, 76 Wn. App. 848, 852, 888 P.2d 750 (1995); *see also In re Parentage of M.F.*, 141 Wn. App. 558, 571, 170 P.3d 601 (2007) (referring to "statutorily required findings for adequate cause" in RCW 26.09.260), *aff'd on other grounds*, 168 Wn.2d 528, 228 P.3d 1270 (2010). "Custodial changes are viewed as highly disruptive to children, and there is a strong presumption in favor of custodial continuity and against modification." *Shryock*, 76 Wn. App. at 850. With this policy in mind, RCW 26.09.260 favors continuity and disfavors modification. *Taddeo-Smith*, 127 Wn. App. at 404.

¶33 A party moving for a custody modification must submit an affidavit stating facts that support the motion. RCW 26.09.270; *In re Custody of T.L.*, 165 Wn. App. 268, 275, 268 P.3d 963 (2011). The nonmoving party must be given notice and the opportunity to file opposing affidavits. RCW 26.09.270. Unless the affidavits establish adequate

cause for a hearing, the trial court must deny the motion. RCW 26.09.270; *T.L.*, 165 Wn. App. at 276.

¶34 A court shall not modify a custody decree unless it finds, based on facts arising since the previous plan was entered or facts that were unknown to the court at the time the previous plan was entered, that a substantial change in circumstances has occurred in the life of the child or the nonmoving party, such that modification is in the child's best interests and is necessary to serve those interests. RCW 26.09.260(1); *see In re Marriage of Adler*, 131 Wn. App. 717, 724, 129 P.3d 293 (2006) (best interests of child remain protected by standards in RCW 26.09.260 as applied by court in modification proceeding).

¶35 In applying these standards, the court must retain the residential schedule established by the decree unless one of four circumstances is satisfied, including that "[t]he child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child." RCW 26.09.260(2)(c).

C. The Standard Used To Vacate the Nonparental Custody Decree

¶36 Because DSHS did not move for modification under RCW 26.09.270 with the necessary supporting affidavits, the trial court made no required adequate cause determination under the statute. DSHS argues on appeal that its factual allegations in the dependency petition were a sufficient substitute for affidavits required under RCW 26.09.270, and that the issue of adequate cause was addressed at the initial shelter care hearing.

¶37 But even if the requirements of RCW 26.09.270 were satisfied, the requirements of RCW 26.09.260 were not. The trial court entered no written findings pertinent to its initial decision to set aside the nonparental custody decree. In its oral ruling, it made no reference to any substantial change in circumstances that had occurred in the life of

RSG or Aker since the entry of the nonparental custody decree. Nor did it find that RSG's residence in Aker's home was detrimental to her physical, mental, or emotional health and that the harm likely to be caused by a change of environment was outweighed by the advantage of a change. It completely ignored the presumption in favor of continuity and against modification, focusing instead on the best interests of the child standard and the information regarding Aker's history with DSHS and CPS.

¶38 In its letter ruling denying Aker's motion for reconsideration, the trial court asserted for the first time that it had treated DSHS's motion to set aside the custody decree as a motion to modify under RCW 26.10.190 and RCW 26.09.260. The court then stated, without explanation, that Aker's custody of RSG was detrimental to RSG's physical, mental, and emotional health and that any harm resulting from a change of custody was outweighed by its advantages.

¶39 DSHS argues that even if the statutory modification standards applied, the trial court's rulings substantially complied with these standards. This is not the case, as the ruling denying reconsideration again ignored the threshold and mandatory finding regarding a substantial change in circumstances. The trial court did not apply the mandatory standards in RCW 26.09.260, and it did not make the required findings.

D. Substantial Change of Circumstances

¶40 If DSHS wanted to modify Aker's custody of RSG, RCW 26.09.260(1) required DSHS to provide proof that a substantial change in circumstances had occurred in the life of RSG or Aker, based on facts arising since entry of the nonparental custody decree or facts unknown to the court at the time, such that modification was in RSG's best interests and necessary to serve those interests.

¶41 DSHS argues that it is unclear what the original trial court knew about Aker's circumstances when it entered the nonparental custody decree. It then asserts that

regardless of what the original trial court knew, the decree could be modified based on facts that had arisen since the decree's entry, including Aker's marijuana use and dysfunctional relationship with her daughters. To show a substantial change in RSG's circumstances, DSHS cites "uncontroverted evidence" that RSG was developmentally delayed when she entered foster care and that she has made progress since.

¶42 When Aker moved for reconsideration, she cited RCW 26.10.135(1), which requires a court to consult the judicial information system before granting any custody order to determine the existence of any information and proceedings relevant to the child's placement. The statute also requires the court, before entering a final order, to direct DSHS to release information as provided by RCW 13.50.100. RCW 26.10.135(2)(a). Under RCW 13.50.100, DSHS may release information regarding investigations in which the child was an alleged victim of abandonment, abuse, or neglect, and information from proceedings where the petitioner for custody was the subject of a founded CPS investigation. RCW 13.50.100(4)(a).

¶43 In compliance with RCW 26.10.135, the nonparental custody case file included an order directing DSHS to release information about Aker, as provided by RCW 13.50-.100, to the court. DSHS appears to be correct, however, in asserting that disclosure under RCW 13.50.100 was not warranted because there was no founded allegation of abuse or neglect as to Aker.

¶44 But regardless of the disclosure requirements, Aker also submitted copies of several orders related to the 2006 dependency proceedings that were signed by the trial judge who signed the nonparental custody decree. These orders undermine DSHS's claim that the first judge knew nothing about Aker's history, even if RCW 13.50.100 did not require its disclosure.

¶45 As to facts arising since entry of the nonparental custody decree, Aker's marijuana use was well documented

before the entry of that decree, although she did state at the time that she was not using marijuana or alcohol. Her dysfunctional family relationships were also well established when the nonparental custody decree was entered. Thus, whether the continuing family conflict or Aker's current marijuana use constitute a substantial change in her circumstances seems questionable.

¶46 With regard to changes in RSG's circumstances, the record shows that two days after her placement in shelter care a health examination revealed that she was in good physical health. RSG was then two and one-half years old and her health report identified possible concerns with her communication and problem solving skills, but it identified no social, emotional, or behavioral concerns. Whether her skills have improved because of her placement in foster care or because of her natural development, describing such improvement as a substantial change in circumstances is again debatable. Thus, it does not appear that DSHS satisfied the substantial change in circumstances showing required under RCW 26.09.260(1).

¶47 RCW 26.09.260(2)(c) requires the court to retain the residential schedule established by the nonparental custody decree unless there is proof that the child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change in environment is outweighed by the advantage of a change to the child. Although Aker argues that there was no evidence that her marijuana use had a negative impact on RSG, she admitted during the shelter care hearing that she was sometimes under the influence of marijuana when she drove RSG home from Jessica's house after work. In addition, RSG could have accessed the marijuana on Aker's nightstand. Other evidence included the allegations of verbal abuse from Jessica, who did not testify at the fact-finding hearing, and a social worker's opinion that RSG's developmental delays were attributable to her unstable lifestyle with Aker.

¶48 DSHS also faulted Aker for allowing RSG to have unsupervised contact with Jennifer, but the nonparental custody decree imposed no supervision requirement, and both Jennifer and Aker maintained that Jennifer was never unsupervised with RSG. DSHS provided no evidence of the harm that might be caused by a change in environment, and the only evidence of advantage from a change was one social worker's observation that RSG was "blossoming" and gaining skills in foster care. RP (morning session) at 93.

¶49 DSHS's changing arguments and pleadings amounted to a moving target that left Aker without a means to confront and respond to its allegations in a meaningful and comprehensive manner. Furthermore, this confusion caused the trial court to rule based on the generalized basis of best interests of the child, without regard for the applicable standards and procedures. Because this matter was not clearly pleaded and developed, the trial court's procedures did not comply with the requirements of RCW 26.09-.260 and .270, and the trial court failed to make any findings regarding a change of circumstances or other required findings relevant to a modification determination.

¶50 We are left with no idea of what statute, rule, or standard the trial court applied when vacating the nonparental custody decree other than the best interests of the child, with a later "detriment to the child" argument added on reconsideration. The court's ruling was inadequate under both CR 60 and RCW 26.09.260. We thus vacate the order vacating and dismissing Aker's nonparental custody decree.

II. DEPENDENT CHILD FINDING

¶51 Courts have broad discretion in dependency proceedings to receive and evaluate evidence in light of a child's best interest. *In re Welfare of B.D.F.*, 126 Wn. App. 562, 574, 109 P.3d 464 (2005). We review a dependency decision for abuse of discretion, which is found if the

exercise of the discretion is manifestly unreasonable or based on untenable grounds or reasons. *In re Dependency of D.C.-M.*, 162 Wn. App. 149, 158, 253 P.3d 112 (2011).

¶52 Aker assigns error to the following finding of fact in the dependency order:

2.3 **Statutory Basis:** The child is dependent according to RCW 13.34.030, in that the child:

. . . .

(b) is abused or neglected, as defined in Chapter 26.44 RCW, by a person legally responsible for the care of the child; and/or

(c) has no parent, guardian or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

CP at 98.

¶53 Aker argues that the trial court abused its discretion in finding that RSG was a dependent child because DSHS failed to provide any evidence that she abused or neglected RSG, or that RSG lacked a custodian capable of adequately caring for her. DSHS responds that the trial court entered the order of dependency as to Jennifer after setting aside the nonparental custody as to Aker and that it therefore made no findings regarding whether RSG was a dependent child as to Aker. We agree with DSHS and hold that the dependency finding on Jennifer does not apply to Aker. If DSHS decides that a dependency should be established as to Aker, a proper petition and supporting information must be filed.[6]

---

[6] Aker contends that she is capable of adequately caring for RSG and that there is no showing that she created a danger of substantial damage to RSG's psychological or physical development. This is a strong argument, particularly if Aker engages in drug treatment with DSHS's assistance. The result of further modification proceedings may eliminate the need to consider whether RSG is a dependent child.

III. Foster Care Placement

¶54 We review a placement decision in a dependency proceeding for abuse of discretion. *In re Dependency of A.C.*, 74 Wn. App. 271, 275, 873 P.2d 535 (1994). Here, the dependency petition was pursued solely against Jennifer, but its foster care provisions clearly affected Aker's rights as RGS's legal custodian.

¶55 We briefly address the two remaining findings of fact in the dependency order that Aker challenges:

> 2.4 **Placement:** . . . . It is currently contrary to the child's welfare to return home. The child should be placed or remain in the custody, control and care of DSHS/Supervising Agency for the following reasons . . . there is no parent or guardian available to care for the child[.]
>
> The child should be placed or remain in[ l]icensed care because there is no relative or other suitable person who is willing, appropriate, and available to care for the child, with whom the child has a relationship and is comfortable.
>
> 2.5 **Reasonable Efforts:** DSHS/Supervising Agency made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home; but those efforts were unsuccessful because . . . [t]he health, safety, and welfare of the child cannot be adequately protected in the home.
>
> . . . Specific services have been offered or provided to the parent(s), guardian or legal custodian and have failed to prevent the need for out-of-home placement and make it possible for the child to return home. The following services have been offered or provided to the child and the child's parent(s), guardian or legal custodian . . . as listed in the [individual service and safety plan] (ISSP).

CP at 99.

¶56 Aker argues that the trial court abused its discretion by placing RSG in foster care because there was no evidence that she was in manifest danger in Aker's home. But a finding of manifest danger is only one of the justifications for an out-of-home placement and it is not the

justification for the trial court's foster care decision here. After a fact-finding hearing on a dependency petition, the court may order out-of-home placement if it finds that reasonable efforts have been made to prevent the need for removal and (a) there is no parent or guardian available to care for the child; (b) the parent, guardian, or legal custodian is not willing to take custody; or (c) the court finds a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home. RCW 13.34.130(5). Because the trial court found that there was no parent or guardian available to care for RSG, it did not need to rest its decision on the "manifest danger" alternative.

¶57 There is no evidence, however, that DSHS provided RSG's legal custodian specific services that failed to prevent the need for foster care. Although the dependency order recites that DSHS offered services to Aker to prevent foster care placement, the record is clear that DSHS refused to provide any services to Aker, even though she requested drug treatment services to address her marijuana use. The ISSP on file at the time of the dependency order listed several services that had been offered to Aker in the distant past during dependencies related to her now adult daughters and stated that RSG was at a significant risk of harm partly because of Aker's inability to follow through with the recommended chemical dependency treatment.[7]

¶58 But DSHS had steadfastly refused to assist Aker with the cost of drug treatment services with regard to RSG, the one area of valid concern. After DSHS filed its dependency petition, Aker requested an order requiring DSHS to pay the costs of drug treatment services, arguing that as RSG's nonparental custodian she was a party to the

---

[7] The main purpose of an ISSP is to identify the basis of the dependency proceedings and the services the parent needs. *In re Welfare of M.G.*, 148 Wn. App. 781, 789-90, 201 P.3d 354 (2009). Aker apparently was unable to follow through with the chemical dependency services in earlier years due to her work schedule.

dependency and eligible to receive services to correct perceived parental deficiencies. As support, Aker cited RCW 13.34.025(2), which provides that remedial services offered during dependency proceedings to correct parental deficiencies may be provided to caregivers other than parents. Such services include substance abuse treatment. RCW 13.34.025(2)(a). Aker also cited RCW 13.34.062, which sets forth the notice of rights that must be provided to parents, custodians, or legal guardians when a child is placed in shelter care. DSHS must provide notification that once it takes a child into custody, it will create a permanency plan for the child, which includes primary and secondary placement goals and which recommends needed services. RCW 13.34.062(2)(b). "The department . . . is required to make reasonable efforts to provide you with services to address your parenting problems." RCW 13.34.062(2)(b).

¶59 In response to Aker's request, DSHS denied any obligation to provide her with services, stating that its permanent plan was to return RSG to her mother's care and that Aker was not part of that plan, contrary to the statutory directions requiring it to provide services to custodians. Even though Aker is RSG's legal custodian and DSHS has refused her services, DSHS maintains that the secondary plan is to place RSG for adoption.

¶60 DSHS explained during the fact-finding hearing that it was providing Jennifer with services before the dependency ruling because it was recommending her as the parent.[8] During closing argument, Aker's attorney requested that his client be made an alternate permanent placement and that the court order DSHS to pay for her substance abuse treatment. The trial court refused to make Aker part of RSG's permanent placement plan and because it vacated Aker's custody rights to RSG, it did not require

---

[8] During oral argument, we learned that DSHS has petitioned for termination of Jennifer's parental rights with regard to RSG. Wash. Court of Appeals oral argument, *In re Welfare of RSG*, No. 42681-1-II (Oct. 16, 2012) at 41 min., 28 sec.—41 min., 38 sec. (on file with court).

DSHS to provide services to her. But because we hold that the trial court abused its discretion in vacating Aker's custody decree, it necessarily erred in refusing to require DSHS to consider Aker as RSG's custodian. Moreover, if DSHS's evidence was adequate to show that a dependency was necessary as to Aker, the trial court erred in refusing to require DSHS to provide services to Aker to maintain that familial bond and custody placement.

¶61 We reverse and vacate the order setting aside Aker's nonparental custody decree and order that her custody rights be restored. We also remand for further proceedings that (1) are to occur within 45 days of issuance of this interlocutory decision under RAP 12.2, (2) acknowledge and respect Aker's nonparental custody rights, and (3) reevaluate the need for RSG's foster care placement with Aker as her custodian.

¶62 Should DSHS pursue dependency as to Aker, it will be required to adhere to its statutory duties to provide legal representation, notice, a shelter care hearing, and services, if necessary, to Aker in a good faith attempt to quickly reunite this child with her maternal family. Furthermore, any petition to modify Aker's custody rights as to RSG under the nonparental custody decree must follow the statutory requirements to avoid additional needless and harmful disruption to RSG's life.

¶63 Following hearing on this remand to the trial court, the parties shall supplement the record on appeal with the trial court's order(s) within 15 days of issuance of the order(s). This is not an opinion terminating our review. No mandate will issue until 30 days following our final opinion, which will be filed in a timely manner after receipt of the trial court order(s) in accord with our remand decision. RAP 12.5(b).

WORSWICK, C.J., concurs.

QUINN-BRINTNALL, J., concurs in the result only.