# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>A.H., J.H., and O.H.,<br><br>        Minor Children. | Consolidated Nos. 46591-4-II,<br>47371-2-II, 47381-0-II<br><br>UNPUBLISHED OPINION |

BJORGEN, A.C.J. — SE and JH (Parents) appeal the juvenile[1] court's order finding their

three children, AH, JH, and OH,[2] dependent and requiring out-of-home placement for the

children.

The Parents argue that the trial court's two grounds for finding dependency were not

supported by its findings or substantial evidence in the record.  Those grounds were that the

Parents' actions posed (1) a clear and present danger to the children's health, welfare, or safety

and (2) a danger of substantial damage to their children's psychological or physical development.

---

[1] The full name is Thurston County Family and Juvenile Court.

[2] In all opinions, orders, and rulings, we shall use initials or pseudonyms in place of the
juveniles' names and in place of the juveniles' parents' names for all appeals concerning juvenile
dependency proceedings under chapter 13.34 RCW.  Gen. Order 2006-1 of Division II, *In re The
Welfare of All Juveniles Found Dependent under Chapter 13.34 RCW*,
http://courts.wa.gov/appellate_trial_courts/.

In addition, they argue that substantial evidence does not support the juvenile court's findings that (3) the Department of Social and Health Services (DSHS) provided reasonable efforts to prevent out-of-home placement and (4) clear, cogent, and convincing evidence shows a manifest danger exists that the children will suffer serious abuse or neglect if not removed from the home.

We hold that substantial evidence supports sufficient findings to uphold its conclusions that the children are dependent and require out-of-home placement. Accordingly, we affirm.

FACTS

I. PROCEDURE

In January 2014, DSHS filed a dependency petition for AH, JH, and OH.[3] On the same day, the juvenile court found reasonable grounds to believe that the children were dependent and ordered that the children be taken out of their parents' custody. A subsequent shelter care hearing determined that the children should be placed outside the home pending later adjudication of the dependency proceeding.

Following a bench trial in June 2014, the juvenile court entered identical dependency orders as to AH, JH, and OH with the same findings of fact and conclusions of law. While DSHS alleged several grounds for finding the children dependent,[4] the juvenile court found only two grounds persuasive: failure to supervise the children around sex offenders and drug users and environmental neglect.

_____

[3] A primary reason for the dependency petition was the death by pneumonia of another of the Parents' children. Though contested at trial as to establishing various grounds for dependency, we recognize it has no bearing on the finding of dependency as to AH, JH, and OH because the juvenile court concluded that the Parents were not responsible for the death of that child.

[4] The juvenile court explicitly rejected DSHS's allegations of medical neglect, educational neglect, substance abuse, and domestic violence. These findings are not challenged on appeal.

2

These two grounds led the juvenile court to conclude that a preponderance of the evidence supported the dependency findings because (1) the children had been "abused or neglected, as defined in Chapter 26.44 RCW, by a person legally responsible for the care of the child" and (2) "no parent . . . [is] capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." Clerk's Papers (CP) at 304.

As to the out-of-home placement, the juvenile court entered findings (1) that DSHS made "reasonable efforts to prevent or eliminate the need for removal of the child[ren]," CP at 305, and (2) "by clear, cogent, and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect if the child[ren are] not removed from the home, and an order under RCW 26.44.063 [would] not protect the child[ren] from danger." CP at 304.

Based on these, the children were found dependent and placed outside the home with other relatives. On appeal, a commissioner of our court considered this matter on an accelerated basis under RAP 18.13A. The commissioner affirmed the juvenile court. The Parents filed a motion to modify the commissioner's ruling, which we granted and set before a panel of judges for consideration.

## II. JUVENILE COURT FINDINGS AND TESTIMONY

1.      Parental Failure to Supervise

In its findings of fact, the juvenile court found it "concerning that the children appear to trust too many adults including persons with criminal history" and "have not learned proper boundaries regarding access to other persons." CP at 318.

Denise Johnson, a social worker working with the family, testified that the children did not have proper boundaries when around adults, which raised "red flags" about the children's

3

behavior. Report of Proceedings (RP) at 83. Specifically, she stated the children "were very open to new people" and "were really friendly, overly friendly." RP at 83. She found this particularly concerning because there were reports that the children had been touched in a sexual manner, and that the Parents allowed sex offenders to be around the children. She stated that this was a "recipe for sexual abuse." RP at 83-84. Other witnesses testified that there had been registered sex offenders around the children and that the Parents were aware that these people were sex offenders. The testimony established that the sex offenders had been around the Parents' children in 2010 to 2013, but not afterwards.

In addition, the juvenile court found that the children were around adults with known drug problems, including SE's parents and brother. Testimony from SE, her brother, and her father supported this finding. However, as to SE's parents, the juvenile court did "not accept the state's allegation that [they], our [sic] career drug addicts. Lifelong drug issues was [sic] not proven." CP at 318. As to SE's brother, the juvenile court found that he "lived in [the Parents'] home for a month, then was sent to prison for methamphetamine, but he was never allowed unsupervised [contact] around [the] children." CP at 319.

2.      Environmental Neglect

Many witnesses testified on the issue of environmental neglect, although the juvenile court found that it was "difficult to find credible evidence regarding environmental neglect." CP at 319. The juvenile court, however, did find environmental neglect because it was "corroborated by the [S]tate's first witness" Marlyn Blazer. CP at 319. Blazer was the parents' friend and had been in the family's home eight to ten times. During the first visit, Blazer testified that she found the place "really dirty" and that her "feet kind of stuck on the floor." RP at 13. She testified that there was food all over the home and a "really noticeable" cigarette

4

smoke smell. RP at 14-15. Blazer testified that on subsequent visits to the home it had gotten "worse"—that there were "more ashtrays and cigarette butts" and "[animal] feces on the floor" each time she was there. RP at 19. She also testified that the children would not be bathed for a few days and that their hair was not brushed. RP at 24. The majority of her visits to the home occurred in early 2013 with a final visit in January 2014.

In addition, the juvenile court considered other witnesses' testimony in finding environmental neglect. Detective Jamie Gallagher testified that he visited the parents' home after the report of their son's death in January 2014. Out of the 200 or so houses that Gallagher had investigated, he said it was "probably one of the worst houses" he had seen. RP at 637. He testified that the house had a "really strong ammonia smell," that there were "animal feces" and "dirty diapers" all over the floor, and that there was rotting food on the counters. RP at 634. He also testified that there was an unsafe electrical outlet in a wall of the bathroom. All of this testimony was supported by photographic evidence that Gallagher took of the parents' home.

Susan Arslanian testified that she had rented a home to the Parents between 2008 and 2012. She testified that when they moved out "[it] was absolutely filthy" and that there were "fly specks on every surface, the ceilings, the walls, the doors, the cupboards, everywhere" and that many parts of the house were "solid with black mold." RP at 53-54. She also testified that it "took three adults full time for a month to clean the house." RP at 53. She testified that out of her 20 years of dealing with rentals it was "among the worst" she had ever seen. RP at 58.

Lindsay Rutt, a DSHS employee who had worked with the family in 2010 or 2011 and then again in February 2014, testified that at the time of the dependency trial she still had many safety concerns about the home. Specifically, she said she had concerns about "the cleanliness of the house" and "the cleanliness of the children." RP at 348. She testified that "[n]othing has

5

been remedied from the time that the initial CPS investigation was completed" in 2013. RP at 348.[5]

## 3. Reasonable Efforts

The juvenile court found that DSHS made reasonable efforts to prevent the children from being placed outside the parents' home. It found that those efforts were "unsuccessful because: [t]he health, safety, and welfare of the child[ren] cannot be adequately protected in the home" and that DSHS "offered voluntary services from May 2013 to July 2013." CP at 305.

Johnson was assigned to the Parents' case as a family volunteer services social worker in May and July 2013.[6] Johnson worked with the family about 7.75 hours in total over a three month period. Johnson reported each month about the cleanliness of the home, which remained stable during her work with the family. Johnson also testified that SE received many resources to protect her children from sexual abuse, including counseling services and a parent support group. According to Johnson's testimony JH was not willing or able to engage with any of the family preservation services she offered.

## ANALYSIS

### I. STANDARD OF REVIEW

The trial court has broad discretion in dealing with matters of child welfare, and we review orders issued in dependency cases for an abuse of discretion. *In re Welfare of R.S.G.*, 172

---

[5] Rebecca Daughtry, a DSHS employee who had worked with the family after Gallagher reported to DSHS, attempted to visit the home on Jan. 10, 2014, but the appellants refused to allow her into the home. She testified to this at trial.

[6] Johnson had been assigned there in part because the initial intake worker, Dayna Marr, had found the home "very cluttered" and smelled of ammonia and feces. RP at 1340. She testified to this at trial.

Wn. App. 230, 250, 289 P.3d 708 (2012), *opinion after remand*, 174 Wn. App. 410 (2013). The

trial court abuses its discretion when its decision "is manifestly unreasonable or based on

untenable grounds or reasons." *Id.* at 250-51.

We review a claim of insufficient evidence in a dependency case to determine whether

substantial evidence supports the juvenile court's findings of fact and whether its findings

support its conclusions of law. *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824

(2013).[7] Evidence is substantial if, when viewed in the light most favorable to the party

prevailing below, a rational trier of fact could find the fact in question by a preponderance of the

evidence. *Id.* We do not weigh the evidence or assess witness credibility. *Id.*

## II. DEPENDENCY

SE and JH first challenge whether substantial evidence supports the juvenile court's

findings of fact 2.2 and 2.3, that the children are dependent, and findings of fact 4 and 5, the

grounds for finding dependency. They also challenge whether these findings support its

conclusions of law 3.4, 4.1, D and E supporting dependency.[8] This challenge fails.[9] While there

---

[7] The trial court's determination that clear, cogent, and convincing evidence supports the
presence of a manifest danger was denominated a finding of fact, but is more in the nature of a
conclusion of law. Our analysis examines it under the standards for each. *See Scott's
Excavating Vancouver, LLC v. Winlock Props., LLC*, 176 Wn. App. 335, 342, 308 P.3d 791
(2013), *review denied*, *First-Citizens Bank & Trust Co. v. Gibbs & Olson, Inc.*, 179 Wn.2d 1011
(2014). "We review a conclusion of law erroneously labeled a finding of fact as a conclusion of
law and review a finding of fact erroneously labeled as a conclusion of law as a finding of
fact.").

[8] Because conclusions of law D and E cover the statutory bases for dependency, we focus the
dependency analysis on them. Our analysis, though, also applies to all challenged findings and
conclusions relating to dependency.

[9] JH also challenged conclusion of law C, assignment of error 7. Conclusion of law C, however,
states that "[t]he evidence *failed* to prove, by a preponderance of the evidence, substance abuse
by the [P]arents and reports of domestic violence in the home." CP at 325 (emphasis added).

is not substantial evidence in the record to support finding of fact 4, the juvenile court's finding

of failure to supervise, there is substantial evidence in the record to support finding of fact 5,

environmental neglect. The environmental neglect finding, in turn, supports conclusion of law E

to the extent it found dependency on that basis. Accordingly, we affirm the dependency order.

1.      Legal Principles

"Parents have a fundamental liberty interest in the care and welfare of their minor

children." *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). The

legislature has declared that "the family unit should remain intact unless a child's right to

conditions of basic nurture, health, or safety is jeopardized." RCW 13.34.020. If the children's

health is jeopardized, however, the State has a "'parens patriae right and responsibility to

intervene to protect the child.'" *Schermer*, 161 Wn.2d at 941 (quoting *In re Welfare of Sumey*,

94 Wn.2d 757, 762, 621 P.2d 108 (1980)) This is because "'the rights and safety of the child . . .

shall be the paramount concern.'" *Id.* at 942 (alteration in original) (quoting RCW 13.34.020).

To that end, the legislature has provided a procedure by which a child may be declared

"dependent," transferring legal custody to the State. *Id.*

The legislature has set out several grounds on which a child may be found dependent.

One ground is that a child "[i]s abused or neglected as defined in chapter 26.44 RCW by a

person legally responsible for the care of the child." RCW 13.34.030(6)(b). "Abuse or neglect"

is defined, in part,  as "injury of a child by any person under circumstances which cause harm to

the child's health, welfare, or safety . . . or *the negligent treatment or maltreatment* of a child by

_____

Given JH's position in this appeal, we assume that this was an error and not that he is arguing
that we should reconsider this finding to support the dependency petition.

a person responsible for or providing care to the child." RCW 26.44.020(1) (emphasis added).

The legislature further defines negligent treatment or maltreatment as

> an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute *a clear and present danger* to a child's health, welfare, or safety.

RCW 26.44.020(16) (emphasis added). We refer to this ground as a "(b)-dependency" from RCW 13.34.030(6)(b).

A child also may be found dependent if the child "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." RCW 13.34.030(6)(c). Under this ground, it is unnecessary to find parental misconduct in order to find a child dependent. *Schermer*, 161 Wn.2d at 944. Instead, this dependency ground considers "both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs." *Id.* We refer to this as a "(c)-dependency" from RCW 13.34.030(6)(c).

A (b) or (c)-dependency determination "does not require proof of actual harm, only a 'danger' of harm." *Id.* at 951. When determining whether to enter a dependency order, a trial court has broad discretion to consider all the facts and evaluate the risk of harm. *See Id.* at 951-52.

2.      RCW 13.34.030(6)(b): Clear and Present Danger to Health, Welfare, or Safety

While a trial court has broad discretion in making dependency determinations, *Schermer*, 161 Wn.2d at 944, we have created some boundaries in the context of failing to protect a child around a potentially dangerous adult. Specifically, we have examined a child's vulnerabilities as well as the nature of the actions of the adult involved in making this determination. For

9

example, Division One of our court found substantial evidence for the trial court's (b)-dependency finding when a mother sent her child with a man on a road trip whom she had just connected with through a personal ad. *In re Interest of J.F.*, 109 Wn. App. 718, 731, 37 P.3d 1227 (2001). The mother knew that her child had previously been sexually abused by a man she had also met through a personal ad. *Id.* She also knew that the man she sent her child with the second time had an extensive criminal history, including convictions for assault and stalking. *Id.*

In contrast, Division One held a trial court's (b)-dependency finding insufficient where a mother allowed her child to be around a man who had been convicted of assaulting his own infant child. *In re Dependency of M.S.D.*, 144 Wn. App. 468, 471, 481-83, 182 P.3d 978 (2008). The court specifically observed that the man had lived with the child for about six years and the child was now seven years old, rendering the man's conviction for assaulting an infant less significant. *Id.* at 481. However, the court noted that if the dependency proceeding had taken place when the child was still an infant, "the significance of [his] criminal conviction of assault of a child and the scope of the danger [to the child] would weigh heavily in favor of finding a clear and present danger." *Id.* Here, the juvenile court found, in finding of fact 4, that the Parents failed to supervise their children around both sex offenders and drug users and, in finding of fact 5.1, that they neglected their children's environment. Based on these findings, the court concluded in conclusions of law D and E that this constituted a (b)-dependency. Substantial evidence supports the finding of environmental neglect in finding of fact 5, which upholds the (b)-dependency conclusion under conclusion of law E. However, there is not substantial evidence to support finding of fact 4 that the Parents failed to supervise their children around adults with criminal histories.

In findings of fact 4.1 and 4.2, the juvenile court found that the children "trust too many adults including persons with criminal history" and that they do not have "proper boundaries regarding access to other persons." CP at 318. The record supports these findings, but only to the extent that the Parents had failed to supervise their children before DSHS intervened with family preservation services. The evidence only shows that the sex offenders were around the children almost two years prior to the filing of the dependency action. We find that this case is closer to *M.S.D.* rather than *J.F.*, considering there was little, if any, evidence that the children were around any sex offenders after DSHS became involved in mid-2013 and provided resources to protect the children. In addition, while there was evidence that the children were around SE's parents and brother who all had criminal histories for drug offenses, the juvenile court found in unchallenged findings of fact 4.3 and 4.4.6 that SE's parents were not career drug addicts and that SE's brother had never been unsupervised around the children. For these reasons, there was not substantial evidence in the record to support findings that the Parents failed to properly supervise their children. Accordingly, this cannot be used to uphold a (b)-dependency.

However, the juvenile court also found in finding of fact 5.1 that the Parents neglected their children's environment to their harm. This finding is supported by substantial evidence in the record. Blazer testified that the house was dirty and had animal feces on the floor and that the children were not bathed for days. She based these assessments on eight to ten visits, and had last visited the home the day the original dependency proceeding was filed in this case. The court also considered the testimony of Gallagher, Arslanian, Rebecca Daughtry, and Rutt in supporting environmental neglect. These witnesses' testimony demonstrate that the Parents had subjected their children to environmental neglect, remedied that problem for a time, but then once again subjected their children to deplorable conditions.

11

This finding supports the juvenile court's (b)-dependency conclusion under conclusion of law E. The court did not err in holding the children dependent under RCW 13.34.030(6)(b).

3.      RCW 13.34.030(6)(c):  Substantial Damage to Psychological or Physical Development

A trial court has broad discretion in determining a (c)-dependency. *Schermer*, 161 Wn.2d at 951-52. As discussed *supra*, substantial evidence supported the juvenile court's finding of fact 5.1 that the Parents neglected their children's environment to their harm.[10] With the character of the neglect and harm shown by the evidence summarized above, this finding supports a (c)-dependency conclusion under conclusion of law E. As in *In re Dependency of Brown*, 149 Wn.2d 836, 72 P.3d 757 (2003), an environment where there is a cycle of deplorable home conditions can support a (c)-dependency conclusion.

The Parents argue that a (c)-dependency conclusion—unlike a (b)-dependency conclusion—must be supported by a finding of *present* parental deficiency in order to be supported by substantial evidence. The Parents rely on *Brown* for this proposition. The *Brown* court indeed states that a dependency conclusion cannot be solely based on *past* conduct. *See Brown*, 149 Wn.2d at 841. However, contrary to the Parents' position, *Brown* does not require the juvenile court to make express findings regarding present conduct causing harm to the child. *See Id.* at 841-42. Like a (b)-dependency, a (c)-dependency simply requires a showing of *danger* of future harm to the child—not present harm. RCW 13.34.030(6)(c).

Our Supreme Court rebuffed a similar argument in *Schermer*, 161 Wn.2d at 951. The court found error in the trial court's finding that a child could not "be found dependent so long as

---

[10] The Parents also assign error to the court's "dependency finding under RCW 13.34.030(6)(c)," without specifying a finding number. Our analysis covers any findings or conclusions that might constitute a "dependency finding."

he was safe *presently*, today . . . the day of the dependency hearing." *Id.* (emphasis added).

Citing *Brown* as an example, the court stated that a "trial court has much broader discretion than

the court recognized in this case" and found that evidence that the parents' mentally unstable

child would soon be released from a secure residential facility, in tandem with the parents' fear

of and inability to care for the child, was sufficient to show the "'danger of harm" required for a

(c)-dependency finding. *Id.* at 951-952.

Therefore, the juvenile court's finding of fact 5.1, that the Parents subjected their children

to environmental neglect, is legally sufficient to support its (c)-dependency conclusion under

conclusion of law E.

### III. OUT-OF-HOME PLACEMENT

The Parents argue that substantial evidence does not support the juvenile court's findings

of fact 2.4, 2.5, and 4.7[11] and that the findings do not support section 4.4 of the order, directing

placement outside the home.[12] This argument also fails. There is substantial evidence to support

finding of fact 2.5 that DSHS provided voluntary services to the Parents. In turn, this finding

and the evidence on which it is based supports the finding that DSHS provided reasonable efforts

to address the specific problems that created the children's dependency. The other principal

component of finding 2.5, that despite DSHS's reasonable efforts, the health, safety, and welfare

---

[11] Finding of fact 4.7 is about the visitation rights of SE and JH and how the children will be placed with relatives of theirs. JH made no argument in his brief that he wants a different visitation placement for his children in the event we uphold the dependency and out-of-home placement order. Therefore, this finding need not be considered further.

[12] JH also assigns error to finding of fact 6.6.1. We assume JH means finding of fact 6.1, since there is no finding 6.6.1. We will not further address finding of fact 6.1, however, because it concerns visitation rights of a family friend who became estranged during the course of the dependency process. We assume JH assigned error to this finding as part of challenging placement away from the home, which is addressed in this section.

of the children cannot be protected adequately in the home, is supported by the substantial

evidence of environmental neglect. The evidence of environmental neglect also supplies

substantial evidence supporting finding of fact 2.4, that there is clear, convincing, and cogent

evidence that a manifest danger exists and the children will suffer serious abuse or neglect if not

removed from the home. Accordingly, we uphold the out-of-home placement order.

1.      Legal Principles

If, after a fact-finding hearing, it has been proven by a preponderance of the evidence that

a child is dependent, the trial court can order either that the child remain in the home with the

parents or be placed outside the home. RCW 13.34.130. The court may order out-of-home

placement

> only if the court finds that reasonable efforts have been made to prevent or eliminate
> the need for removal of the child from the child's home and to make it possible for
> the child to return home, specifying the services, including housing assistance, that
> have been provided to the child and the child's parent, guardian, or legal custodian,
> and that preventive services have been offered or provided and have failed to
> prevent the need for out-of-home placement, *unless the health, safety, and welfare
> of the child cannot be protected adequately in the home*, and that:
>  . . . .
> (c) The court finds, by clear, cogent, and convincing evidence, a manifest danger
> exists that the child will suffer serious abuse or neglect if the child is not removed
> from the home and an order under RCW  would not protect the child from danger.

RCW 13.34.130(5) (emphasis added). The italicized clause in the excerpt above does not

relieve department from making reasonable efforts and providing preventative services,

but specifies simply that out-of-home placement is warranted if the child cannot be

adequately protected in the home. *Cf. R.S.G.*, 172 Wn. App. at 252-55.

2.      Reasonable Efforts

Under finding of fact 2.5, the juvenile court found that DSHS made reasonable efforts to

prevent removal of the children from the parents' home and that the "Department offered

voluntary services from May 2013 to July 2013." CP at 305. Johnson's testimony, as well as the initial intake form, the monthly progress reports, and the exit report are all evidence that DSHS attempted to prevent out-of-home placement of the children, specifically by addressing the cleanliness of the home. Despite Johnson's attempt to work with JH, he was not willing or able to do so.

SE argues that she was only offered "very cursory services approximately six months before the children were removed." Br. of Appellant (SE) at iv. She also argues that she should have been offered "intensive family preservation services" to meet the requirement of "reasonable efforts" under the statute. Br. of Appellant (SE) at 16. The requirement of reasonable efforts, however, does not demand that all conceivable efforts be made. The requirement does demand, though, that the efforts be tailored to the parents' needs in preventing out-of-home placement. *See R.S.G.*, 172 Wn. App. at 253-55. For example, in *R.S.G.*, we found that reasonable efforts had *not* been made when the guardian specifically asked for help with costs for services, yet DSHS "steadfastly refused to assist her." *Id.* Despite a dependency order stating that DSHS had offered services to the guardian to prevent out-of-home foster care placement, "the record [was] clear that DSHS refused to provide services to [her], even though she requested drug treatment services." *Id.*

In contrast to *R.S.G.*, there is testimony here, and some documentation, that supports a finding of reasonable efforts. Johnson gave volunteer services that attempted to prevent an out-of-home placement based on a specific problem of the dependency: environmental neglect. Johnson reported each month about the cleanliness of the home, which indicates that DSHS was at least monitoring and attempting to ensure that the home remained proper for the children.

Therefore, the record supports finding of fact 2.5 that the voluntary services provided in May to July 2013 constituted reasonable efforts to prevent out-of-home placement of the children.

3.      Manifest Danger

Despite the reasonable efforts, the juvenile court found in findings of fact 2.4 and 2.5 that "[t]he health, safety, and welfare of the child cannot be protected adequately in the home" and that "clear, cogent and convincing evidence [shows] that a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home."[13]  CP at 304-05. These findings are consistent with the findings of environmental neglect under finding of fact 5 and conclusion of law E which, as shown above, are supported by substantial evidence in the record.

The Parents argue that the environmental neglect could have "been addressed through an in-home dependency."  Br. of Appellant (SE) at 15; Br. of Appellant (JH) at 10-11.  But along with the pattern of the environmental neglect in the past, there is substantial evidence in the record that the home returned to a deplorable condition at the time of the petition for dependency, after the services of DSHS had been provided.  Ultimately, this demonstrated a cycle of environmental neglect that the Parents were unable to alleviate even after DSHS intervened.  This supplies clear, cogent, and convincing evidence of a manifest danger that the child will suffer serious abuse or neglect if not removed from the home, meeting the standards of RCW 13.34.130(5)(c).

---

[13] Treated as a conclusion of law, this determination would also be upheld, since it flows from and is supported by the findings of environmental neglect.

16

CONCLUSION

We hold that the juvenile court's conclusions of (b)- and (c)-dependency are supported by the findings of environmental neglect. The record contains substantial evidence to support these findings. We also hold that the court's conclusion that the children be placed outside the home is supported by the findings that reasonable efforts were provided to attempt to alleviate the environmental neglect, but that despite those efforts, the health, safety, and welfare of the parents' children could not be protected adequately in the home. This conclusion is also supported by the juvenile court's determination that clear, cogent, and convincing evidence shows that a manifest danger exists if the children are returned to the home, whether that determination is deemed a finding or a conclusion. Accordingly, the juvenile court did not err in finding the three children dependent and ordering out-of-home placement. Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, A.C.J.

BJORGEN, A.C.J.

We concur:

MAXA, J.

LEE, J.