FILED
COURT OF APPEALS
DIVISION II

2013 APR 16 AM 9: 07

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| In the Matter of the Welfare of: | No. 42681-1-II |
|---|---|
| R.S.G. | PUBLISHED OPINION |

VAN DEREN, J. — Following our interlocutory decision filed on December 7, 2012, the trial court held a shelter care hearing on January 16 and 17, 2013. The trial court ordered RSG's[1] continued placement in foster care after declining to place her with her grandmother, Christine Aker. The trial court also declined to order the Washington State Department of Social and Health Services (DSHS) to provide Aker with services. Aker seeks to vacate the shelter care hearing order and disqualify the trial judge from presiding over future proceedings in this case. We hold that the trial court more probably than not erred as a matter of law in refusing to order the State to provide services to Aker and, thus, we accept the issues raised in our hearing on March 1, 2013, as an interlocutory appeal of the trial court's response to our interlocutory opinion.

After review of the supplemental record and briefing, and following argument, we hold that the trial court and State substantially complied with our interlocutory decision in that Aker was made a party to the dependency matter, she was provided counsel, the trial court held a two-

---

[1] We identify the minor child by her initials to protect the child's identity.

day shelter care hearing, and the State has agreed to provide her services in accord with our direction to respect Aker's nonparental custody rights to RSG and to reevaluate the need for RSG to remain in foster care. We also hold that the trial judge is not disqualified to continue to manage this matter and that any evidentiary errors did not prejudice Aker. We therefore lift our stay of the trial court proceedings in this dependency matter and remand to the trial court for further proceedings consistent with our rulings in this case.

## FACTS

In our previous decision, we vacated the trial court's order vacating and dismissing Aker's nonparental custody decree. *In re Welfare of R.S.G.*, 172 Wn. App. 230, 289 P.3d 708 (2012). We also held that if DSHS decided that a dependency should be established as to Aker, a proper petition and supporting documentation were required. *R.S.G.*, 172 Wn. App. at 251. We remanded for further proceedings that were to (1) occur within 45 days of our interlocutory decision, (2) acknowledge and respect Aker's nonparental custody rights, and (3) reevaluate the need for RSG's foster care placement with Aker as her custodian. *R.S.G.*, 172 Wn. App. at 255. As we concluded:

> Should DSHS pursue dependency as to Aker, it will be required to adhere to its statutory duties to provide legal representation, notice, a shelter care hearing, and services, if necessary, to Aker in a good faith attempt to quickly reunite this child with her maternal family. Furthermore, any petition to modify Aker's custody rights as to RSG under the nonparental custody decree must follow the statutory requirements to avoid additional needless and harmful disruption to RSG's life.

*R.S.G.*, 172 Wn. App. at 255.

Four days after this decision, DSHS sought a date for a dependency fact-finding hearing as to the nonparental custodian under the prior dependency cause number. Aker filed a memorandum contending that she was entitled to a shelter care hearing and complaining that

DSHS had provided her with limited visitation but no other services. DSHS responded that it wanted the court to enter an order establishing dependency and a case plan with regard to Aker. DSHS was willing to provide services to Aker but argued that returning RSG to Aker's care was not in the child's best interests at this time. RSG's mother, Jennifer Ware, gave birth to a son while the appeal was pending, and RSG and her brother have been placed together in foster care.

The trial court agreed with Aker that it should conduct a shelter care hearing. During that hearing, 10 witnesses testified about Aker's marijuana use, her current living situation, her family history, the history of her involvement with DSHS, and RSG's development in foster care.

The first witness was Bobette Webber, a chemical dependency counselor who testified that when she evaluated Aker in April 2011, Aker did not describe any medical history that would require her to smoke marijuana. Webber evaluated Aker as chemically dependent and recommended treatment.

Justin Washington, a social worker for the Washington State Office of Public Defense, then testified on Aker's behalf. During a recent visit to Aker's home, Washington reviewed the list of 17 safety threats that DSHS reviews when considering removing children from the home. He found no safety threats that would prevent Aker from caring for RSG. He testified that Aker lives in a two-bedroom mobile home with an attached outer room where she smokes cigarettes. Her home is in a trailer park located on a highway. There is no fence between Aker's home and the highway, and the property contains two dilapidated cabins. After reviewing her home for safety threats, Washington gave Aker a parenting test on which she scored as a medium-risk candidate for parenting abuse or neglect.

3

Stephanie Frazier, a supervisor for Washington State Children and Family Services, testified that her assessment of Aker had revealed one safety threat based on "a caregiver who will not or cannot control their behavior and that their behavior impacts child safety." Report of Proceedings (RP) (Jan. 16-17, 2013) at 33-34. Frazier admitted that her assessment was based on information from 2008 and 2009. She recommended continued out-of-home care for RSG while acknowledging that she had not offered Aker any type of services since 2008.

DSHS then called Aker, who testified that she has used marijuana since she was 24 years old. She admitted that her previous testimony that she started using marijuana 18 months ago was untrue. Now 42 years old, Aker stated that several medical needs warrant her use of the drug. Aker described her troubled relationships with her ex-husband and daughters, Jennifer; Jessica; and Justine,[2] and said she would not leave RSG in her daughters' care. She denied any responsibility for 18-year-old Justine's drug use because Justine no longer lives with her. Aker did say that she tries to have family dinners once a week and that Justine is allowed to spend the night when Aker is home. Aker added that she supports herself by working 80 hours a month at a motel.[3]

Aker admitted that RSG had medical needs concerning her eyes as well as developmental needs when DSHS took custody of the child. Aker has had sporadic visits with RSG since her placement in foster care and said that no services or parenting classes were offered at the time of that placement. She added that no parenting classes had been offered since this court's December 2012 decision. Aker also explained that the entire trailer park where she lives was

---

[2] For purposes of clarity, we refer to Jennifer Ware and her sisters by their first names. We mean no disrespect.

[3] The declaration accompanying the respondent's brief states that Aker started a new job in late January 2013.

4

"coming down" and would be totally revamped. New recreational vehicle pads were being added and the park would have a fence to keep children off the highway when it was complete.

Following her cross-examination, the trial judge asked Aker whether she had better judgment now than when she raised her daughters. Aker replied that her judgment improved at age 35, and when asked why, she replied, "I just grew up and quit partying and quit doing the stupid stuff that I used to do when I was younger." RP (Jan. 16-17, 2013) at 82.

RSG's current foster mother testified that when the child came to her 6 months earlier after 15 months in a different foster home, she had significant developmental deficits as well as vision problems. RSG is in special education classes and will need special education services for several years but is making "great progress." RP (Jan. 16-17, 2013) at 92. RSG's first foster mother testified that RSG was put on anxiety medication when first placed in foster care at age two, and that the child scored low for social, emotional, and communication skills.

DSHS social worker Natalie McLaughlin testified about Aker's history of being offered but refusing services such as chemical dependency treatment, anger management, domestic violence services, parenting classes, and random urinalysis [UA] tests. Such services were offered in 1993 and 1996. Aker requested family reconciliation services in 2002 but then said they were not needed. Aker continued to refuse services concerning Jessica in 2004, and she declined to attend a chemical dependency evaluation or take advantage of other services offered in 2006. McLaughlin saw several safety hazards around Aker's home, including the proximity of the highway without any protective fence, a large adjacent lot filled with water, and two unoccupied cabins. The trailer park did not appear to be thriving, but Aker had told McLaughlin that the entire park, including her own home, would be remodeled in three weeks.

5

McLaughlin again emphasized the services offered to Aker, "She has been offered chemical dependency services, domestic violence and anger management services, parenting classes, family counseling, at risk youth petitions on at least four occasions, voluntary placement, [child in need of] CHINS services,[4] family group conference, and family counseling." RP (Jan. 16-17, 2013) at 128. McLaughlin added that safety plans, including plans with regard to RSG, had also been offered, but Aker was not interested. She testified that DSHS remains concerned about Aker's history, her ability to supervise children, and her longtime marijuana use. McLaughlin explained that even though the safety threats she had identified were present when RSG was removed and the dependency petition was filed, Aker had not participated in any services to alter those threats. She saw no significant change in Aker's attitude during a recent conversation. "We talked about why [RSG] was in care and the process, and . . . Aker did not seem to take any responsibility for [RSG's] placement." RP (Jan. 16-17, 2013) at 130. On cross-examination, McLaughlin admitted that her records showed no services offered to Aker since 2011.

Karen Spoonhoward, a social worker with children and family welfare services, then testified that the original plan was for RSG's mother to retain custody but that the family, including Aker, did not follow an extended safety plan. It was Spoonhoward's understanding that after the nonparental custody decree was vacated in 2011, DSHS did not need to provide Aker with services. She added that after this court's decision was filed in December 2012, there was a hearing with Aker about services. Spoonhoward recommended out-of-home care while

_____

[4] According to McLaughlin, CHINS services arise from a child's request for placement or services from DSHS independent of the parent.

Aker engages in services. She added that DSHS would recommend weekly two-hour visits between Aker and RSG, alternating between in-person visitation and video calls.

Aker called Michael Marshall, the clinical director of Healthy Whole Solutions, a state certified outpatient treatment center for addiction. Marshall evaluated Aker on January 14, 2013. He testified that Aker's UA results did not show a nonmedicinal use, based on the tetrahydrocannabinol (THC) levels, as expressed in nanograms. At the close of his redirect examination, the trial court asked Marshall about the results of Aker's January 9th UA:

[QUESTION:] There is no level reported; what was the level?
[ANSWER:] . . . So the level there [are] actually two levels, there is marijuana metabolite which was 416 nanograms per milliliter, and there was a nanogram THC milligrams of creatinine, which is a ratio, that number was 665.1, and the testing was all within normal
. . . .
[QUESTION:] Is it your testimony that levels of THC exceeding 200 or 400 or 700 are within expected ranges of people who are using it medically?
[ANSWER:] I would say that—well, that is a difficult question[ ] to answer. I would say that those are not extraordinarily high levels.
[QUESTION:] What do you consider extraordinarily high?
[ANSWER:] Anything over 2,000 would start to look pretty high to me.

RP (Jan. 16-17, 2013) at 178-79. The court refused to allow Aker's attorney to ask additional questions or make an offer of proof based on the court's questions.

Aker then testified as a rebuttal witness. She stated that DSHS had offered her services 21 months ago that depended on her nonparental custody not being vacated. She said she would get drug treatment and stop using marijuana if the court so ordered, although she would then "have to go on the high powered medications that really hurt me." RP (Jan. 16-17, 2013) at 186-87. If allowed to use prescription marijuana, she would take it early in the morning or late at

night to avoid being under the influence while caring for RSG. Aker recognizes that RSG is a special needs child.

DSHS argued in closing that RSG should stay in foster care rather than return to Aker. It admitted that it had not offered Aker services since her nonparental custody was vacated but added that it had been working to give her services since this court's December decision and would continue to do so. Aker's attorney began his closing by trying to explain his offer of proof regarding UA results, but the court stopped him and ordered him to limit his closing argument to the record. He asked the court to transition RSG back to Aker.

The trial court ordered RSG's continuing placement in shelter care, finding that Aker does not possess the ability or skills to keep RSG safe. The court referred to Aker's long-standing refusal to accept and complete offered services and then discussed Aker's chemical dependency and the fact that she went three counties away to get an evaluation:

> She went up to Port Orchard, comes back with an evaluation from somebody who tried to tell me that unless you hit 2,000 nanograms per milliliter, that you don't have a problem. Well, that's nonsense. I see UA results every day in my work down in juvenile court, and I know that problems develop . . . way before 2,000 . . . . I commit high school kids to an inpatient treatment facility because they can't get their THC levels below 200. And she had a level, ten days ago, of 750.
>     There are at least five states that have adopted statutes, so far, to define levels of THC in the blood that—which person's driving automobiles are considered to be impaired, and those statutes establish ranges between five and ten nanograms per milliliter. And . . . Aker has never had a UA with a result in the five to ten range, they have all been, the lowest one was 38, and had several that were 125, 254, 764, 405, 419. So, the last two she had, which were [on] January 4 and January 9, were 495 and 419. I don't care if marijuana is legal or not, alcohol is legal too, and I put children into shelter care for finding children to be dependent because parents abuse alcohol. Just because it's legal, doesn't mean that you can use it until you are no longer able to function without impairment.

RP (Jan. 16-17, 2013) at 200-01.

The court expressed concern about Aker's ability to ever be a fit parent and found that at this time, there would be a serious threat of substantial harm to RSG if she were returned to her grandmother. The court added that it could not order services. "That doesn't mean they can't be offered and she can't voluntarily accept those services, but it is not my role today to order that any particular services be accepted or engaged in by . . . Aker; that's up to her." RP (Jan. 16-17, 2013) at 202.

After the trial court entered a written order, Aker moved for reconsideration based in part on the court's refusal to allow her attorney to make an offer of proof explaining the difference between THC levels in blood and urine. Before the trial court could rule on her motion, Aker moved in this court for an order disqualifying the trial judge from presiding over further proceedings in the case, and she also filed a supplemental brief seeking to vacate the shelter care hearing order. We stayed further proceedings, which included a ruling on the motion for reconsideration and a dependency fact-finding hearing, pending our consideration of Aker's requests.

## ANALYSIS

Aker argues that the shelter care hearing order violated this court's decision and RCW 13.34.065. Based on the record from the shelter care hearing, we disagree.

I.  SHELTER CARE FINDINGS AND EVIDENCE

Aker assigns error to several findings in the shelter care order, including the findings that DSHS made reasonable efforts to prevent the need for RSG's removal from her, that the risk of imminent harm to RSG establishes reasonable cause for her continued out-of-home placement pending the fact-finding hearing, and that specific services offered or provided have been unable to remedy the unsafe conditions in the home and make it possible for RSG to return. The trial

9

court made the related finding: that shelter care was needed because it would be contrary to RSG's welfare to return home, as she has no legal custodian to provide supervision or care, and her release would present a serious threat of substantial harm. The court did not find that any services were required, and in finding of fact 2.12, it specifically addressed Aker's limitations:

(a) Ms. Aker currently does not possess the ability or skills to keep a child of [RSG's] age safe.

(b) Ms. Aker does not have the ability based on her history, to recognize dangers of potential harm to a child of this age, and to keep a child of [RSG]'s age out of danger and out of harm[']s way.

(c) Ms. Aker suffers from a serious lack of acceptable parenting skills. By her own admission, the behavior of Ms. Aker's three biological children w[as] beyond her control beginning at the time the oldest daughter, Jennifer, was the age of six years. Ms. Aker feels that all three of her biological children are habitual liars.

(d) Ms. Aker was in a domestic violent relationship with . . . her [ex-]husband. When [her ex-husband] was charged with child abuse, she made excuses for him, denied that he was physically violent to one of her daughters, despite her own knowledge that he was a physically violent person. Even after being convicted of a crime, Ms. Aker continues to minimize his responsibility.

(e) Ms. Aker doesn't demonstrate any understanding of the relationship between her parenting skills or deficits and the emotional and psychological development of her children.

(f) Ms. Aker's three biological children have during times of their lives been completely dysfunctional. They had serious issues and she accepts no responsibility for their behaviors.

(g) Ms. Aker doesn't understand that there is a relationship between what a parent does and how a child acts.

(h) While in Ms. Aker's care, [RSG] was left with inappropriate persons. At age three, [RSG] was found wandering in a parking lot due to a lack of supervision by these inappropriate supervisors.

(i) The evidence establishes a long standing refusal of Ms. Aker to accept and complete offered services. Ms. Aker has been offered services on multiple occasions since 1993 and has always either refused the services or found excuses for not accepting and completing those services, excuses that the court does not find valid.

(j) Ms. Aker has been diagnosed on at least three prior occasions as having cannabis abuse or dependency. Only recently did she obtain an evaluation from yet a fourth evaluator who did not feel the levels of cannabis abuse that Ms. Aker demonstrated were of concern. That evaluator said that even in light of the fact that the current law defines being impaired as significantly lower

tha[n] what his assessment [wa]s. The court does not find that evaluation credible.

(k) Ms. Aker's chemical dependency use affects her ability to be a safe parent.

(l) [RSG] cannot be safely placed with Ms. Aker at this time. There would be a serious threat of substantial harm to this child if she were returned to Ms. Aker.

Suppl. Clerk's Papers (CP) at 403. The court concluded that DSHS had the authority to place RSG in licensed foster care.

Aker does not challenge the evidentiary support for the challenged findings, except for the finding regarding Marshall's credibility. *See In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990) (this court reviews challenged findings of fact for substantial evidence). That challenge is discussed below as part of issue III.

DSHS asserts that Aker lacks authority to challenge the shelter care hearing order or its findings because she has not filed a notice of appeal or sought discretionary review. But our interlocutory decision ordered the parties to supplement the record on appeal with the trial court's orders within 15 days of their issuance, after which we would issue our final opinion. *R.S.G.*, 172 Wn. App. at 255. This language was designed to ensure that we could order relief as necessary. Moreover, we hold that the trial court committed error in ruling that it could not order the State to provide services to Aker. Accordingly, DSHS's procedural challenge to Aker's requests for relief fails.

Aker also asserts that the trial court failed to comply with RCW 13.34.065 and this court's decision when it did not require DSHS to file a new dependency petition. But Aker is at least partly responsible for the trial court's decision to proceed with a shelter care hearing despite DSHS's failure to file a new dependency petition. After obtaining the hearing date, DSHS explained that the earlier dependency petition referred to Aker and included allegations against

her and that a dependency fact finding with regard to Aker was now appropriate. Aker objected, not because a new dependency petition was required, but because she was entitled to a shelter care hearing. "[A]ssuming that DSHS is now including . . . Aker in the [initial] dependency cause number . . . the appropriate action is a Shelter Care Hearing." Suppl. CP at 415.

Moreover, DSHS argues that it did not need to file a new dependency petition to comply with this court's decision requiring the agency to provide legal representation, notice, a shelter care hearing, and services if it chose to pursue dependency as to Aker. DSHS contends that the allegations in the amended dependency petition addressed its concerns regarding Aker's ability to safely and appropriately parent RSG. Aker was appointed counsel, provided notice of each hearing in the dependency, and treated as a party to the dependency. Because there were no new allegations regarding Aker, DSHS determined that it was not necessary to file a second dependency petition to provide her with notice of its allegations concerning her parenting abilities. Given Aker's acquiescence in that decision, the trial court did not err in failing to require DSHS to file a new dependency petition.

Aker also contends that the trial court did not comply with this court's instructions when it declined to order services following the shelter care hearing. The primary purpose of a shelter care hearing is to determine whether the child can be immediately and safely returned home while the adjudication of the dependency is pending. RCW 13.34.065(1)(a). During the hearing, the trial court must make several inquiries, including what services were provided to the family to prevent or eliminate the need for removal of the child from the child's home; whether any orders for examinations, evaluations, or immediate services are needed; and the terms and conditions for parental, sibling, and family visitation. RCW 13.34.065(4)(d), (j), (k). At the conclusion of the hearing,

12

the court shall release a child alleged to be dependent to the care, custody, and control of the child's parent, guardian, or legal custodian unless the court finds there is reasonable cause to believe that:

(i) After consideration of the specific services that have been provided, reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home; and

(ii)(A) The child has no parent, guardian, or legal custodian to provide supervision and care for such child; or

(B) The release of such child would present a serious threat of substantial harm to such child.

RCW 13.34.065(5)(a).

The trial court erred in concluding that it had no authority to order services. RCW 13.34.065(4)(j), (k). The trial court did add, however, that services could be provided. In a declaration accompanying its brief, DSHS sets forth the services now being put in place for Aker, including visitation. *See* RCW 13.34.136(2)(b)(ii) (visitation is the right of the family and may be limited or denied only if the court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare).

According to Karen Spoonhoward, one of the social workers who testified at the shelter care hearing,[5] Aker contacted DSHS on December 17, 2012, about visitation with RSG. DSHS representatives met with Aker and the attorneys in the case on December 27 to discuss services that included visitation, chemical dependency treatment, psychological evaluation, parenting instruction, and a parenting protection group. On January 16, 2013, Spoonhoward supervised a visit between Aker and RSG and subsequently filed a visit referral with the Multicultural Center. On February 1, Spoonhoward received confirmation that the center would be scheduling visits,

---

[5] DSHS supplemented the record before us with numerous facts about services to be offered and about Aker's circumstances, most of which occurred after the shelter care hearing. We cannot consider those matters in deciding this issue but do comment that it is clear that even though the trial judge did not order DSHS to provide services to Aker, it has offered them consistent with our interlocutory opinion.

but she arranged visits on February 15 and 22 elsewhere when that schedule was not forthcoming. The Multicultural Center then informed Spoonhoward that weekly visits would begin February 25.

With regard to chemical dependency treatment, Spoonhoward notes that Aker has agreed to another chemical dependency evaluation. Aker was informed that she would need to contact an agency to schedule her intake and assessment and that this assessment will be paid through the Community Service Office. After some confusion, Aker agreed to contact the agency and schedule the evaluation. If recommended for treatment, Spoonhoward states that Aker will need to take advantage of the sliding fee scale or look to community resources to obtain funding.

With regard to parenting classes, Spoonhoward reports that Aker is currently participating in a class and has been scheduled for another. Aker has been referred to a parenting protection group and can begin attending any Monday session.

Aker also will be referred for a domestic violence assessment, paid for by DSHS. Spoonhoward adds that Aker will need to pay for any services that are recommended. Aker has agreed to participate in this evaluation. Finally, Aker has agreed to participate in a psychological evaluation with a parenting assessment.

As we noted in our interlocutory decision, Aker requested an order requiring DSHS to pay for drug treatment services after it filed the initial dependency petition. She argued that as RSG's nonparental custodian, she was a party to the dependency and eligible to receive remedial services to correct perceived parental deficiencies under RCW 13.34.025. This statute requires DSHS to coordinate services to parents and children in child dependency cases. RCW 13.34.025(1); *In re Dependency of Tyler L.*, 150 Wn. App. 800, 805-06, 208 P.3d 1287 (2009). Such services may include individual counseling, substance abuse treatment, mental health

14

services, assistance to address domestic violence, and transportation to and from any of these services. RCW 13.34.025(2)(a). The statute addresses funding for these remedial services:

> (b) The [D]epartment shall provide funds for remedial services if the parent is unable to pay to the extent funding is appropriated in the operating budget or otherwise available to the [D]epartment for specific services. As a condition for receiving funded remedial services, the court may inquire into the parent's ability to pay for all or part of such services or may require that the parent make appropriate applications for funding to alternative funding sources for such services.
>
> (c) If court-ordered remedial services are unavailable for any reason, including lack of funding . . . the [D]epartment or supervising agency shall promptly notify the court that the parent is unable to engage in the treatment due to inability to access such services.

RCW 13.34.025(2).

Our interlocutory decision also referred to RCW 13.34.062, which sets forth the notice of rights that must be provided to parents, custodians, or legal guardians when a child is placed in shelter care. DSHS must provide notification that once it takes a child into custody, it will create a permanency plan for the child, which includes primary and secondary placement goals and which recommends needed services. RCW 13.34.062(2)(b). The statute addressing permanency plans provides that such plans "shall specify what services the parents will be offered to enable them to resume custody, what requirements the parents must meet to resume custody, and the time limit for each service plan and parental requirement." RCW 13.34.136(2)(b)(i). The statute addresses funding in this manner:

> The supervising agency or [D]epartment shall provide all reasonable services that are available within the [D]epartment or supervising agency, or within the community, or those services which the [D]epartment has existing contracts to purchase. It shall report to the court if it is unable to provide such services.

RCW 13.34.136(2)(b)(vi). At a minimum, this statutory obligation requires the State to provide the parent with a referral list of agencies or organizations to provide the services. *In re Welfare of Hall*, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983) (citing RCW 13.34.180(1)(d)).

In our interlocutory decision, we ordered DSHS to adhere to its statutory obligations to provide Aker with services. While these obligations do not require DSHS to fund remedial services without qualification, they arguably require DSHS to assist Aker in obtaining the necessary funding.[6] When the proceedings below are viewed overall, however, it does not appear that DSHS and the trial court declined to follow our earlier instructions. Despite the absence of a new dependency petition, Aker's custody rights were acknowledged and the need for RSG's foster care placement was reevaluated during the two-day shelter care hearing. A court may order shelter care without regard to services offered if it concludes that release to the child's home would present a serious threat of substantial harm to the child. RCW 13.34.065(5)(a)(ii)(B). Given Aker's physical environment, her marijuana use, her need for parenting services, and a possible need for psychological treatment, it does not appear that the trial court erred in concluding that a return to her home at this time would present RSG with a serious threat of harm. We, thus, uphold RSG's foster care placement and require DSHS to help Aker obtain funding for the services recommended after her evaluations are complete. We also allow the parties to proceed with the dependency fact-finding hearing and the development of a permanency plan.

---

[6] Aker does not appear eligible for chemical dependency treatment under the Alcoholism and Drug Addiction Treatment and Support Act, chapter 74.50 RCW, which provides state-financed treatment and support to chemically dependent indigent persons. WAC 388-800-0040; WAC 182-508-0330.

II.    NO DISQUALIFICATION OF TRIAL JUDGE WARRANTED

Aker also argues that we should disqualify the trial judge because he has demonstrated actual prejudice against her, her interests, and her attorney. She bases this argument on the trial judge's failure to require DSHS to file a new dependency petition and provide her with services, and on his failure to allow additional questions or an offer of proof on the issue of THC levels in urine and blood.

RCW 4.12.040(1) provides that no superior court judge shall hear or try any action or proceeding when that judge "is prejudiced against any party or attorney, or the interest of any party or attorney appearing in such cause." RCW 4.12.050(1) states that any party may establish prejudice by filing a motion and supporting affidavit alleging that the judge before whom an action is pending is prejudiced against that party or that party's interests. If a motion is not timely made, the movant must show actual prejudice. *State v. Hawkins*, 164 Wn. App. 705, 713, 265 P.3d 185 (2011), *review denied*, 173 Wn.2d 1025 (2012). A motion is untimely if filed after the judge makes a discretionary ruling in the case and the party moving for disqualification received adequate notice of that ruling. *Hawkins*, 164 Wn. App. at 713. Aker acknowledges that she is required to show actual prejudice.

Due process, the appearance of fairness, and the Code of Judicial Conduct require disqualification of a judge who is biased against a party or whose impartiality may be reasonably questioned. *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 841, 14 P.3d 877 (2000). "For a judge to be biased or prejudiced against a person's cause is to have a preconceived adverse opinion with reference to it, without just grounds or before sufficient knowledge. It is a particular person's state of mind that affects his opinion or judgment." *In re*

17

No. 42681-1-II

*Application of Borchert*, 57 Wn.2d 719, 722, 359 P.2d 789 (1961). The trial court is presumed to perform its functions without bias or prejudice. *Wolfkill Feed & Fertilizer*, 103 Wn. App. at 841.

Aker first contends that actual prejudice is shown by the trial court's refusal to enforce this court's decision requiring DSHS to file a proper dependency petition and to provide services, if necessary, in a good faith attempt to reunite RSG with her maternal family. It should be noted that Aker did not object to the hearing date on this basis or move to compel DSHS to file a new dependency petition. Instead, Aker's attorney argued at the beginning of the hearing that our decision supported the need for a shelter care hearing, and the trial court's acceptance of her argument does not demonstrate actual prejudice.

At the conclusion of the shelter care hearing, the trial judge ruled that because he was ordering RSG's continuing placement in foster care, he was not allowed to order services for RSG. He did add that DSHS could offer services and that Aker could accept them. As DSHS acknowledges, the trial judge did have authority to order services under RCW 13.34.065(4)(j), which provides that at a shelter care hearing, the court shall inquire into whether any orders for immediate services are needed. "The court may not order a parent to undergo . . . services at the shelter care hearing unless the parent agrees to the service." RCW 13.34.065(4)(j). The parties did not bring this provision to the court's attention, however, and the fact that the trial judge failed to exercise his authority thereunder does not warrant his disqualification from this case.

Aker also contends that the trial judge showed actual prejudice by refusing to allow her attorney to ask follow-up questions after the court questioned Marshall about Aker's THC levels and by refusing to allow an offer of proof regarding THC levels in blood and urine. As a result of this refusal, Aker argues that the trial court erroneously conflated THC levels in the blood

18

with those in urine and found that Marshall's evaluation of Aker was not credible because current law defines being impaired as significantly lower than his assessment.

A trial lawyer has the right to make the record for appeal. *Barci v. Intalco Aluminum Corp.*, 11 Wn. App. 342, 346 n.1, 522 P.2d 1159 (1974). Where evidence is excluded, the court must permit counsel to make an offer of proof so that the propriety of the proposed but excluded evidence may be examined as to admissibility. *Barci*, 11 Wn. App. at 346 n.1. "The exclusion by the court of a proffer of testimony by interrogating the witness or by counsel reciting the evidence that would be presented precludes review and is erroneous." *Barci*, 11 Wn. App. at 346 n.1.

DSHS responds that under ER 1101(c)(3), the rules of evidence do not apply to dependency proceedings. 5C KARL B. TEGLAND, EVIDENCE: LAW AND PRACTICE: ER 1101, § 1101.12 at 37 (5th ed. 2012). ER 1101 actually states, however, that the rules of evidence "need not" apply to such proceedings. ER 1101(c)(3). DSHS then contends that even if the trial judge did err, such error did not demonstrate bias on his part. Finally, DSHS observes that Aker moved to disqualify the trial judge before he had a chance to consider her motion for reconsideration and the accompanying declaration from Marshall explaining the difference between THC levels in blood and urine.

While the trial court may have erred in refusing to allow Aker's attorney to question Marshall further about the difference between THC levels in blood and urine and to make an offer of proof, that error does not demonstrate actual prejudice, particularly where the court has not had the opportunity to reconsider its ruling. We deny Aker's motion to disqualify the trial judge from further proceedings in this case.

III. NO PREJUDICIAL ERROR FROM REFUSAL TO ALLOW OFFER OF PROOF

Aker argues that the trial judge erred in denying her counsel's request to make an offer of proof on the difference between THC levels in urine and blood samples. This issue reasserts the claim of evidentiary error made in connection with Aker's motion to disqualify the trial judge.

There is no standard in Washington law for the proper level of THC in urine. Washington law does provide that a person is guilty of driving while intoxicated if he has a THC concentration of 5.00 or higher in his blood level within two hours of driving. RCW 46.61.502(1)(b). The trial court compared this level of THC concentration with Aker's UA results and found them widely disproportionate. The court also found that Marshall's evaluation of Aker lacked credibility after noting that Marshall did not feel that Aker's level of marijuana use was of concern, even though "current law defines being impaired as significantly lower tha[n] what his assessment is." Suppl. CP at 403. Aker's motion for reconsideration argued that the trial court was incorrectly comparing THC levels in blood and urine, and Marshall filed a supporting declaration underscoring that argument:

> Washington State has now joined other states in legalizing marijuana for recreational use (I-502), and set the limit for incapacitation (impairment) at 5ng. It is important to note that this limit is established by way of a blood test to determine the THC level in the blood. It should also be noted that a blood test is significantly different than a urine drug screen. Whereas a blood test determines the presence of THC in the blood, a urine drug screen determines the presence of a metabolite that is produced by the presence of THC in the body. The level of THC in the blood, 5ng for example, does not translate directly to the level of metabolite found in the urine, 500ng to 700ng, for example. The half-life of THC in the blood is measured in hours—about 2 to 4 hours—whereas the half-life of marijuana metabolite measured in the urine is one to five days, but the median is between 36-48 hours.

Suppl. CP at 447. The trial court has yet to rule on Aker's motion for reconsideration. But, given the court's extensive findings regarding Aker's inadequacies, it does not appear that

No. 42681-1-II

Marshall's testimony or declaration would have changed its decision.[7] If error did occur in the trial court's handling of Marshall's testimony, it does not appear to have been prejudicial. *See State v. Benn*, 161 Wn.2d 256, 268, 165 P.3d 1232 (2007) (evidentiary error must be prejudicial to warrant reversal).

We hereby lift the stay we imposed on the dependency proceedings in this matter and return it to the trial court. We decline Aker's request to vacate the shelter care order requiring foster care placement for RSG. We do hold that DSHS must continue providing Aker with services designed to facilitate her reunification with RSG while assisting her in obtaining the necessary funding so long as the dependency matter proceeds. Finally, we deny Aker's motion to disqualify the trial judge from presiding over further proceedings in this case.

VAN DEREN, J.

We concur:

QUINN-BRINTNALL, J.

WORSWICK, C.J.

---

[7] Moreover, Aker has already agreed to another chemical dependency evaluation.

21