# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of ) No. 76565-5-I

C.D.S., )
D.O.B.: 11/06/2011, ) DIVISION ONE

Minor child. ) UNPUBLISHED OPINION

) FILED: February 26, 2018

TRICKEY, A.C.J. — Jason Abrahamson appeals the order terminating his parental rights to his son. Abrahamson contends that the record does not support the juvenile court's finding that the Department of Social and Health Services offered or provided all necessary services, reasonably available, capable of correcting his parental deficiencies within the foreseeable future. He also claims that certain findings are supported only by inadmissible hearsay. Because substantial evidence supports the court's finding that necessary and reasonably available services were offered or provided and because findings about letters to Abrahamson's son were not prejudicial, we affirm the termination order.

## FACTS

Jason Abrahamson is the father of C.D.S., a son born on November 6, 2011. Abrahamson has a history of drug use and substantial criminal history, largely related to his drug use, which predates his son's birth. Since 2003, Abrahamson has been arrested and/or has faced criminal charges on over 70

occasions. In 2003, Abrahamson was convicted of multiple counts of robbery and was imprisoned for approximately seven years.

Following his release from prison in 2010, Abrahamson spent approximately three years in the community. C.D.S. was born during this period. Also during this time, the State charged Abrahamson with several misdemeanor offenses, including unlawful entry, possession of stolen property, assault, theft, possessing a fraudulent driver's license, and making a false statement to a public servant. He spent at total of four to six months in jail on these charges.

On October 3, 2013, just before C.D.S. was two years old, Abrahamson went to prison again to serve the sentence imposed on twelve convictions of identity theft and forgery. Abrahamson was sentenced under the Special Drug Offender Sentencing Alternative to 36.75 months incarceration, followed by an equal term of community custody. Abrahamson served most of his sentence at the Monroe Correctional Complex.

About a year and a half after Abrahamson went back to prison, in February 2015, C.D.S. came to the attention of the Department of Social and Health Services (Department). C.D.S. was three years old and living with his mother and maternal grandmother. He was placed out of the home in April 2015, and has not lived with either parent since that time. The Department initially placed C.D.S. in the care of his maternal great grandmother, then his aunt, and finally, in May 2016, placed him in foster care with prospective adoptive parents. C.D.S.'s mother eventually relinquished her parental rights and is not a party to this appeal.

The court entered an order of dependency with respect to Abrahamson in September 2015. In the dispositional order, the court ordered Abrahamson to obtain a drug and alcohol evaluation, and participate in random urinalysis testing, parenting classes, and the "InsideOut Dad" program.[1]

Social worker Debra Price was assigned to the case in April 2015 for about a month, and then permanently reassigned four months later, in August 2015. Between September 2015 and March 2016, Price communicated with Abrahamson on a monthly basis through telephone calls and letters. Abrahamson and Price generally discussed the services that were available to Abrahamson in prison, possible placements for C.D.S., and planning for Abrahamson's release. While in prison, Abrahamson completed a Department of Corrections (DOC) substance abuse treatment program and the court-ordered "InsideOut Dad" program.[2] In May 2016, the Department filed a petition to terminate Abrahamson's parental rights.

In May or June of 2016, the social worker learned that Abrahamson had been transferred to another DOC facility and then to the Clark County Jail, where he was being held on a pending escape charge.

Abrahamson was released in November 2016, just after C.D.S. turned five years old. Abrahamson did not inform the social worker of his release but the social worker learned about it when she called Abrahamson's father's home and she promptly arranged visits with C.D.S. Abrahamson attended two visits with C.D.S, in November and December of 2016. Halfway through the first visit,

---

[1] Clerk's Papers at 42.
[2] CP at 42.

C.D.S. asked Abrahamson what his name was. Abrahamson arrived late to the second visit without any activities for C.D.S., and C.D.S. played with Abrahamson's cellphone for the duration of the visit.

At the December 2016 visit, the social worker provided a letter to Abrahamson outlining the services ordered by the court and referrals for parenting classes and urinalysis testing. The termination trial that had been scheduled for December 2016, was continued in view of Abrahamson's release and his apparent interest in engaging in visitation and services. The social worker scheduled two additional visits for Abrahamson and C.D.S., but Abrahamson did not attend either.

Approximately three weeks after his release from prison, Abrahamson violated his community custody conditions when he tested positive for methamphetamine. Police then arrested Abrahamson on December 27, 2016, and the City of Marysville charged him with possession of drug paraphernalia. He was released, but then failed to report to his probation officer and was arrested again on a warrant on January 2, 2017.

At the time of the trial on the Department's petition in February 2017, Abrahamson was incarcerated in Clark County Jail pending trial on the charge of escape. He had been released pending trial, but the court revoked his bail after he violated conditions of release. Abrahamson faced four or five years of incarceration on the charge. He hoped to be admitted to drug court and had been offered a plea deal of 51 months.

The termination trial took place over two days. C.D.S. was five years old and had seen Abrahamson only twice in the preceding three years. Abrahamson testified by telephone from the Clark County Jail. He said that before he went to prison in 2013, he lived with C.D.S. and his son's mother. Regarding his history of drug use, he testified that he completed court-ordered drug treatment in 2010, but was still using drugs "[o]ff and on," and by 2012, had progressed to using them regularly.[3] After he was imprisoned in 2013, Abrahamson said he communicated with C.D.S. by telephone, video calls, and letters.

Abrahamson expressed hope that he would not be sentenced to prison on his pending charge and said that if released, he planned to secure housing, find employment, and stay clean so he could take care of his son. He estimated that three to six months after his release, he would be in a position to have extended contact with C.D.S.

The social worker testified that in her opinion, Abrahamson's primary parental deficiencies were long-standing drug and alcohol issues and chronic criminal conduct and he would be unable to remedy those deficiencies within the foreseeable future. She testified that C.D.S. had no meaningful relationship with his father and that prolonging his dependency would be detrimental to the child's development and need for stability and permanency. The Guardian Ad Litem (GAL) likewise testified that termination of parental rights was in C.D.S's best interests.

The juvenile court entered more than 120 findings of fact, conclusions of law, and an order terminating Abrahamson's parental rights.

---

[3] Report of Proceedings (RP) at 71.

ANALYSIS

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, it must prove each of six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That, there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; [and]
>
> (f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(a)-(f); see RCW 13.34.190(1)(a)(i); A.B., 168 Wn.2d at 911. Second, if the juvenile court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1)(b); A.B., 168 Wn.2d at 911.

Once the trial court weighs the evidence and enters findings of fact and conclusions of law, this court's review is limited to determining whether those findings of fact are supported by substantial evidence and whether they support the juvenile court's conclusions of law. In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999). In evaluating whether substantial evidence supports the juvenile court's findings, this court will not weigh the evidence or make credibility determinations. In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006). Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

I. Services Offered

Abrahamson contends that the Department failed to prove that it offered or provided all necessary services capable of correcting his parental deficiencies as required by RCW 13.34.180(1)(d). According to Abrahamson, the juvenile court identified his lack of a relationship with his son as a parental deficiency and the termination order hinges on the court's finding that he will be unable to remedy this deficiency in the foreseeable future. He argues that the primary barrier preventing him from developing a relationship with his son was the Department's failure during the dependency period to provide in-person visits or visits through the DOC's "JPAY" system—a video call system similar to Skype.[4]

The court found that the Department made the following relevant findings:

> 2.39 Social Worker Debra Price was assigned to the dependency matter in August 2015. In order to try to facilitate the father's telephonic visitation, Ms. Price made reasonable efforts to arrange for the father to visit with [C.D.S.] by means of a Skype or FaceTime-type program. Ms. Price attempted to arrange this contact through a

---

[4] RP at 121.

program called JPAY, but for various reasons was unable to accomplish this despite her diligent efforts.

. . . .

2.51 The court finds that all services ordered, and all necessary services that were reasonably available and capable of correcting the father's parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided.[5]

Abrahamson's claim fails because, first and foremost, while undeniably crucial for reunification, our courts have held that visitation is not a service for the purposes of proving RCW 13.34.180(1)(d). In re Dependency of T.H., 139 Wn. App. 784, 791-92, 162 P.3d 1141 (2007). The statute's reference to "services" required under RCW 13.34.136, includes "domestic violence counseling, parenting classes, drug and alcohol counseling," random urinalysis, and other similar services. T.H., 139 Wn. App. at 791 (quoting In re Dependency of A.A., 105 Wn. App. 604, 608-09, 20 P.3d 492 (2001)). Visitation, on the other hand, is not rehabilitative in of itself. Nor is this a situation "where visitation is part of a required service," such as a parenting class. T.H., 139 Wn. App. at 792. As the court recognized, the fact that Abrahamson was incarcerated almost continuously since C.D.S. was 23 months old made it difficult for him to establish and maintain a relationship with his son. This unfortunate fact does not transform visitation into a required service the Department was required to provide in order to meet its burden under RCW 13.34.180(1)(d).

Second, Abrahamson mischaracterizes the Department's obligations and efforts. The initial September 2015 dispositional order permitted Abrahamson to have twice monthly supervised contact with C.D.S. by telephone or video calls as

---

[5] CP at 42-43.

arranged by the DOC facility. The order also allowed in-person visitation at the DOC facility, if such visitation was approved by the facility and the travel was not unduly burdensome for C.D.S. The order directed the Department to request funding to use the video call system. Ten months later, when Abrahamson's release appeared to be imminent, a court order following a permanency planning hearing provided for supervised contact by telephone and for supervised visitation upon his release from confinement.

The testimony established that after the social worker was reassigned to the case in August 2015, she investigated visitation through the DOC's JPAY system, but could not secure funding because there was no mechanism in place that allowed the Department to pay the DOC for this service. The social worker then attempted to arrange for in-person visitation at the facility. At the time, C.D.S. was living relatively close to the DOC facility with his aunt. C.D.S.'s aunt and uncle agreed to transport him for in-person visits and indicated on several occasions that they would submit the required forms, but failed to follow through. Nevertheless, C.D.S.'s aunt agreed to telephone contact, the social worker verified that Abrahamson had the aunt's telephone number, but no telephone contact occurred.

After C.D.S. was placed in foster care, the social worker attempted to secure a professional supervisor to bring him to the facility. She submitted a bid for a professional supervisor, and after some time, a provider accepted the contract and completed the facility's approval process. However, when the supervisor attempted to schedule a visit, he learned that Abrahamson had been

transferred to different facility. The social worker testified that it was impossible to facilitate the visitation after Abrahamson moved briefly to the Washington Corrections Center in Shelton and then to the Clark County Jail. Contrary to Abrahamson's argument, the Department's efforts were not limited to submitting an on-line application and sending two e-mails. Although visitation is not a service for purposes of satisfying RCW 13.34.180(1)(d), substantial evidence nonetheless supports the juvenile court's finding that the social worker made reasonable efforts to facilitate visitation.

Third, the premise of Abrahamson's argument is flawed because the Department's inability to facilitate visitation during the dependency period was not the primary reason for the absence of a meaningful relationship with C.D.S. The court's findings also reflect that the termination was based on the cumulative effect of Abrahamson's long-term substance abuse, instability, chronic criminal behavior, and unavailability. It was this chronic criminal behavior that led to a lack of a relationship with his child and made Abrahamson simply unavailable to parent or play any important role in his child's life. For instance, the court found:

> 2.52 The father's parenting deficiencies include substance abuse issues and criminal activity, including lengthy incarceration, as well as lack of parenting skills, and lack of safe and stable housing.
>
> . . . .
>
> 2.57 Though the father completed the two services in prison, there is essentially no evidence in this case that he actually absorbed the necessary knowledge to be in a position to begin to parent the child and remain clean and sober.
>
> 2.58 The father faces the possibility of four or five years in prison on his escape charge.

10

2.59 The father testified that he hopes to be admitted to Drug Court, but there is no evidence that that is a reasonable possibility. Even if the father were admitted to Drug Court, common experience indicates that he would be under intensive supervision and would need to concentrate first and foremost on his recovery. It is difficult to imagine that he would have the time and energy necessary to try to reestablish a relationship with his son.

2.60 The father also will need to deal with the outstanding charges pending against him in the other courts and he may well face additional jail time in he's found guilty of those charges.

. . . .

2.64 The father's parental deficiencies include his drug abuse, which was a problem long before these dependency proceedings began. His ongoing issue with substance abuse is evidenced by his recent relapse and use.

2.65 The father's parental deficiencies also include his chronic criminal history, including new charges being filed just since he was released from prison. This history has rendered him unable to perform his parental obligations.

2.66 The father's parental deficiencies also include his long-term failure to provide a safe and stable home for the child and his lack of any meaningful relationship with the child.

Abrahamson had already been in prison for more than a year and a half when C.D.S. was removed from his home. Although Abrahamson maintains that he communicated with C.D.S. when he was first incarcerated, he does not dispute the fact that when C.D.S. was declared dependent in September 2015, he had not seen C.D.S. in almost two years. C.D.S. does not know Abrahamson because he has been unavailable to form a relationship with him. Nothing the Department could have done in the 14 months between September 2015 and November 2016 would have remedied this. Even if the Department had been able to facilitate an occasional visit in prison or twice monthly JPAY video calls, it

would not have enabled a child of C.D.S.'s age to develop a meaningful relationship.

Abrahamson also appears to claim that the court improperly focused on the effect of his incarceration on his relationship with his child and treated his lengthy incarceration as an "aggravating" factor, rather than as a "mitigating" factor, as required by statute.[6] See RCW 13.34.180(1)(f); RCW 13.34.145(5)(b); In re Parental Rights to K.J.B., 187 Wn.2d 592, 387 P.3d 1072 (2017).

> If a parent is incarcerated, RCW 13.34.180(1)(f) requires the court to
>
>> consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

The trial court may consider the six factors identified in RCW 13.34.145(5)(b) in assessing whether the incarcerated parent "maintains a meaningful role in the child's life":

> (i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;
>
> (ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;
>
> (iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;
>
> (iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but

---

[6] Br. of Appellant at 18.

not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;

(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

Here, the court explicitly considered the statutory incarceration factors, including whether Abrahamson played a meaningful role in his son's life, whether the Department's efforts were reasonable, and whether particular barriers existed. Nothing in the statute suggests that incarceration should be treated as a "mitigating" factor. Contrary to Abrahamson's argument, in considering an incarcerated parent's ability to maintain a meaningful role in a child's life, the court need not "disregard the negative effects that incarceration may have on a delicate parent-child relationship . . . [or] ignore the child's need for timely permanency." In re Welfare of E.D., 195 Wn. App. 673, 695, 381 P.3d 1230 (2016), review denied, 187 Wn.2d 1018, 390 P.3d 351 (2017). The court's acknowledgment that Abrahamson was ultimately responsible for his own behavior which resulted in his lengthy and repeated incarceration was not contrary to nor inconsistent with RCW 13.34.180(1)(f) and RCW 13.34.145(5)(b).

In sum, substantial evidence supports the court's finding that all services ordered and all necessary services that were reasonably available, capable of correcting the father's parental deficiencies within the foreseeable future, were offered or provided.

## II. Hearsay

Abrahamson contends that the trial court erred in considering hearsay evidence included in the GAL report for substantive purposes. In his report, the GAL opined that Abrahamson had little "sustainable interest" in his son.[7] His assessment was based, in part, on the fact that while Abrahamson expressed interest in visiting with his son and wrote letters to the social worker, he wrote no letters to C.D.S. during his three years of incarceration. The GAL's report states that "there is no evidence in the discovery files nor can the child's previous caregivers recall any letters, birthday cards, or holiday cards from the father to his son."[8] Abrahamson claims that the evidence about the prior caregivers' recollections was hearsay, and admissible only to show the basis of the GAL's opinion. Along the same lines, Abrahamson challenges the testimony of the GAL and the social worker about a note in the Department's file reporting that during a 2015 meeting, that neither witness attended, Abrahamson was encouraged to write letters to C.D.S.

An error in the admission of evidence requires reversal only when the error is prejudicial. In re Dependency of R.S.G., 174 Wn. App. 410, 433, 299 P.3d 26 (2013). An error is prejudicial if it has a substantial likelihood of affecting the outcome of the case. R.S.G., 174 Wn. App. at 433.

Here, there is no likelihood that the admission of evidence about whether or not Abrahamson wrote letters to C.D.S. during his incarceration, or was encouraged to do so, affected the outcome of the trial. The court found that

---

[7] CP at 80.
[8] CP at 79.

14

although Abrahamson claimed he had sent letters to C.D.S., there was "no record of such letters."[9] Abrahamson testified that he wrote to C.D.S. but provided no copies of his letters to the Department and it was undisputed that the Department's file did not contain any such letters. Only letters Abrahamson wrote to the social worker were admitted into evidence and no prior caregivers testified at trial. Disregarding the alleged hearsay testimony about C.D.S.'s caregivers' recollections, substantial evidence supports the court's finding that there was "no record" of letters Abrahamson claimed to have sent.[10]

To the extent that the court's finding that Abrahamson agreed in a 2015 meeting to write letters to C.D.S. is supported only by hearsay evidence concerning a note in the Department's file, it is a non-essential finding. Nor was the finding prejudicial in view of Abrahamson's testimony that he did, in fact, write letters to his son.[11]

The properly admitted evidence supports the court's finding that Abrahamson "did little in terms of any expressions or acts of manifesting concern for the child."[12] For instance, the social worker testified that while she provided information to Abrahamson about C.D.S.'s circumstances, he did not request such information. And the evidence indicated that Abrahamson did not take advantage of opportunities to communicate with C.D.S. by telephone during the dependency. When Abrahamson was released in 2016, although he had not seen C.D.S. in three years, he did not initiate contact with the social worker to

---

[9] CP at 41.
[10] CP at 41.
[11] Given the lack of prejudice, we need not address Abrahamson's claim that counsel's failure to object to hearsay testimony amounted to constitutionally deficient performance.
[12] CP at 46.

arrange visitation. The social worker called him. Abrahamson did not introduce himself to C.D.S. when he saw him in 2016, nor did he appear to know how to relate to him. He was late for the second visit, called to cancel the third visit when the social worker and C.D.S. were already enroute, and did not attend the third visit because he was in jail.

In addition to numerous unchallenged findings, the finding that Abrahamson's actions largely did not manifest concern for his child supports the court's determination that his was currently unfit, that his deficiencies could not be remedied in the foreseeable future, and that termination of the parent-child relationship was in C.D.S.'s best interests.

We affirm the juvenile court's order terminating Abrahamson's parental rights.

_____Trickey, ACJ_____

WE CONCUR:

_____Spearman, J._____     _____Dwyer, J._____