# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>Z.R.,<br>D.O.B.: 09/26/2013,<br><br>               Minor child.<br><br>TYREECE KINGSLEY DUNBAR, AKA<br>TYREECE KINGSLEY GARDNER,<br><br>               Appellant,<br><br>           v.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>               Respondent. | No. 75425-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br><br>FILED: June 5, 2017 |

TRICKEY, A.C.J. — Tyreece Dunbar, also known as Tyreece Gardner,[1] challenges the sufficiency of the evidence supporting the trial court's order terminating his parental rights to his daughter, Z.R. Because substantial evidence supports the trial court's findings, which in turn support the conclusions of law terminating Dunbar's parental rights, we affirm.

## FACTS

Z.R. was born on September 26, 2013. Z.R.'s mother tested positive at Z.R.'s birth for amphetamines, methamphetamine, cocaine, benzodiazepines, barbiturates, methadone, and morphine. Z.R. was removed from her mother's

---

[1] The father stated that he preferred to use the last name Gardner, and the trial court's findings of fact supporting termination refer to him as such. We use the name Dunbar because that is how the father is referred to in the paternity and criminal pleadings in the record.

custody at the hospital and placed in foster care. Z.R.'s mother told the Department of Social and Health Services (Department) social worker that she did not know who Z.R.'s father was.

Dunbar learned that he might be the father of Z.R. in January 2014, while he was serving a prison sentence for unlawful possession of a firearm, violation of a no-contact order, and resisting arrest. In October 2014, following his release, genetic testing established that Dunbar was Z.R.'s biological father.

On March 23, 2015, Department social worker Michelle Hetzel wrote a letter to Dunbar, recommending that he participate in random urinalysis testing, a substance abuse evaluation, and mental health services. Hetzel included instructions on how to obtain each of these services. Hetzel also included contact information for the Fatherhood Engagement Program, a program designed to help fathers understand the dependency process, and Project SafeCare, an in-home parenting class. A few days later, Hetzel sent Dunbar another letter with the same information. Dunbar did not participate in any of the recommended services.

Z.R. has significant delays in both language and motor skills, possibly due to prenatal drug exposure. She has received occupational therapy, speech therapy, and infant mental health services since she was only a few months old. The Department arranged for Dunbar to attend Z.R.'s therapy sessions so that he could better understand her needs. Dunbar attended only one occupational therapy appointment and one speech therapy appointment. Though multiple professionals have noted Z.R.'s delays, Dunbar believed their opinions were

exaggerated for the purpose of keeping Z.R. from him. He disagreed that Z.R. had any special needs or that her development required any additional interventions.

Following a trial, dependency was established as to Dunbar on August 31, 2015. The juvenile court ordered Dunbar to do random urinalysis testing four times per month for a period of 90 days, undergo a substance abuse evaluation and a psychological evaluation with a parenting component, and participate in Project SafeCare. The juvenile court also ordered Dunbar to attend all of Z.R.'s medical and therapy appointments, maintain a working telephone number, and establish a safe, stable residence that was suitable for a child of Z.R.'s age. Dunbar was allowed to have four hours of supervised visitation each week. Department social worker Swan Tso called Dunbar multiple times, leaving messages regarding how to participate in his court-ordered services. Tso also left messages with Dunbar's wife, asking her to remind him about the urinalysis testing. Dunbar called Tso back only once, and did not participate in any services. A visitation supervisor also tried to contact Dunbar for visits but never heard back from him.

On September 26, 2015, only a few weeks after the conclusion of the dependency trial, and the same day as Z.R.'s second birthday, Dunbar shot another man twice in the legs. Dunbar was arrested on October 13, 2015 and held in the King County jail, where he remained until the time of the termination trial. Tso attempted to contact the jail to determine whether Dunbar could complete any of his court-ordered services while there, but did not receive any

response. Tso then checked the jail's website and determined that the jail did not offer any services that would have satisfied the court's requirements. Tso also contacted Dr. Robert Deutsch, a Seattle-based psychologist, who has a contract with the Department to perform psychological evaluations, to see if he could evaluate Dunbar in jail. Dr. Deutsch stated he did not perform evaluations in a jail setting. Tso testified that if Dunbar was ultimately transferred to a prison elsewhere in Washington, she would seek a provider close to that facility.

On May 2, 2016, Dunbar pleaded guilty to second degree assault with a deadly weapon and first degree unlawful possession of a firearm. Based on Dunbar's criminal history, he faced a standard sentencing range of 67 to 89 months, plus a sentencing enhancement of 12 months.

Trial on the termination petition began on May 25, 2016, at which point Z.R. was two-and-a-half years old. On June 23, 2016, the trial court entered findings of fact and conclusions of law and an order terminating Dunbar's parental rights. Dunbar appeals.[2]

## ANALYSIS

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:

---

[2] The parental rights of Z.R.'s mother were terminated on March 28, 2016, and she is not a party to this appeal. Ex. 13.

4

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . [; and]

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

Former RCW 13.34.180(1)(a)-(f) (2009).

In 2013, the legislature amended RCW 13.34.180(1)(f) to add three specific factors that a trial court must consider if a parent is incarcerated at the time of the trial:

If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

RCW 13.34.180(1)(f) (LAWS OF 2013, ch. 173 § 4); In re Dependency of D.L.B., 186 Wn.2d 103, 114, 376 P.3d 1099 (2016). A trial court's assessment of RCW

13.34.180(1)(f) in cases involving an incarcerated parent must be "informed by evidence presented and conclusions reached regarding the six factors contained in RCW 13.34.145(5)(b)." In re Dependency of A.M.M., 182 Wn. App. 776, 787, 332 P.3d 500 (2014). Those factors may include:

> (i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;
>
> (ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;
>
> (iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;
>
> (iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;
>
> (v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and
>
> (vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

RCW 13.34.145(5)(b). However, these factors do not compel any particular conclusion regarding termination of parental rights. In re Welfare of E.D., 195 Wn. App. 673, 694-95, 381 P.3d 1230 (2016), review denied, 187 Wn.2d 1018, 390 P.3d 351 (2017).

If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of

the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1)(b). The trial court's findings of fact must be supported by substantial evidence. In re Dependency of K.D.S., 176 Wn.2d 644, 652, 294 P.3d 695 (2013).

## Services

Dunbar challenges the sufficiency of the evidence supporting the trial court's finding that the Department provided him with all necessary services capable of correcting his parental deficiencies. The Department has a statutory obligation to provide all services ordered by the court, as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). A service is "necessary" if it is "needed to address a condition that precludes reunification of the parent and child." A.M.M., 182 Wn. App. at 793. A service is "reasonably available" if it is "available within the department or supervising agency, or within the community" or "the department has existing contracts to purchase" it. RCW 13.34.136(1)(b)(vii). However, if a parent is unwilling or unable to make use of the services offered or provided, the Department is not required to offer additional services that might have been helpful. In re Dependency of S.M.H., 128 Wn. App. 45, 54, 115 P.3d 990 (2005). Moreover, the Department is not required to offer services that would be futile.[3] In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001).

---

[3] In reply, Dunbar asserts that the "futility doctrine" is no longer good law following the 2013 amendments requiring specific considerations for incarcerated parents. Appellant's Reply Br. at 6-7. Because this conclusory contention is raised for the first

Dunbar contends that the Department failed to offer or provide a psychological evaluation. He asserts that the social worker contacted only one provider, and after learning that provider did not perform evaluations in jail, made no further efforts. But Dunbar acknowledged he would not have been permitted to physically engage with Z.R. during a visit at the jail and, thus, a psychological evaluation focused on assessing his parenting abilities would have been of limited value. And Dunbar had not participated in any services throughout the dependency proceedings, aside from two visits with Z.R.'s therapists. Finally, even assuming the Department's efforts were insufficient, it is uncontroverted that Dunbar faced a lengthy prison sentence. As the trial court found, "[Dunbar's] unavailability to participate in services is a direct consequence of his own choice to continue to engage in criminal acts, and the duration of his impending prison sentence renders services futile because no services could render him available to parent Z.R. in the child's near future."[4] This finding was supported by substantial evidence.

Dunbar next argues that because the juvenile court ordered him to maintain a working telephone number and a safe, stable home, the Department was required to provide him with "housing or phone services."[5] But Dunbar testified that he always had a working telephone, and that he could also be reached through his family members. Rather, Dunbar testified at his dependency

---

time in a reply brief and is unsupported by adequate briefing, we decline to consider it. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[4] Clerk's Papers (CP) at 188.

[5] Br. of Appellant at 20-21.

8

trial that it was simply not a priority for him to return the social worker's or the court appointed special advocate's (CASA) phone calls. And because Dunbar was incarcerated within a few weeks of the entry of the dispositional order, housing was not a service the Department could reasonably offer.

Dunbar claims that the Department failed to refer him to Project SafeCare. But the trial court found that this service would have only been appropriate had Dunbar made progress towards reunification, and he had not done so.

> 2.27 Ms. Tso did not explicitly offer or provide [Dunbar] with the Project Safecare service. She testified that she intended to do so once reunification was approaching, since that service is meant to provide practical information to be implemented in the home while the child is transitioning into the home. Reunification has not become imminent, and the service cannot be engaged in while the father is incarcerated. The father was not responsive to Ms. Tso regarding engaging on services prior to his incarceration, and it would have been futile to offer him the service of Project Safecare while he was incarcerated and could not meaningfully participate. Furthermore the service would not have addressed any of the father's primary parental deficiencies, or enabled those deficiencies to be remedied in the near future.[6]

Dunbar does not challenge this finding. Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

Finally, Dunbar contends that the trial court erred in permitting Tso to testify that "[n]one of the services previously ordered by the court were available to [Dunbar] in the jail."[7] He argues that Tso's testimony that she looked at the jail's website, which showed that the jail did not offer Dunbar's court-ordered services, was inadmissible hearsay.

---

[6] CP at 184.
[7] CP at 184.

An error in the admission of evidence requires reversal only when the error is prejudicial. In re Dependency of R.S.G., 174 Wn. App. 410, 433, 299 P.3d 26 (2013) (citing State v. Benn, 161 Wn.2d 256, 268, 165 P.3d 1232 (2007)). An error is prejudicial if it has a substantial likelihood of affecting the outcome of the case. R.S.G., 174 Wn. App. at 433.

Here, there is no likelihood the admission of the evidence affected the outcome of the trial. First, Dunbar corroborated the social worker's testimony with his own personal knowledge. Dunbar testified that the jail typically did not offer rehabilitative programs and services because "you're just being housed for court."[8] He also testified that none of his court-ordered services were available in the jail:

> Uh, I got a, uh – a psych evaluation, and, uhm, it said that I was depressed. Uhm, but other than that, there's not really any, uhm – they weren't able to offer me any random UAs, or UAs, or anything like that. They weren't able to, uh – and all the other classes were – had to do with me attending, uh, classes my daughter would be, uh, in. So – but other than a psych evaluation, that's all I was able to do from in here.[9]

Moreover, the court found that even if services had been available, they would be futile because Dunbar would be incarcerated so long that "no services could render him available to parent Z.R. in the child's near future."[10] Thus, even if the admission of the evidence was error, it was harmless.

---

[8] Report of Proceedings (RP) at 127.
[9] RP at 91.
[10] CP at 188.

Continuation of the Parent-Child Relationship

Dunbar asserts that the Department failed to establish pursuant to RCW 13.34.180)1)(f) that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home" because the trial court failed to properly consider the additional statutory factors relevant to incarcerated parents. We disagree.

*Barriers*

Dunbar first contends that the trial court failed to consider the barriers to reunification that he experienced throughout his incarceration. Specifically, Dunbar contends that barriers existed because the Department never offered him any visitation with Z.R. in jail.

Under RCW 13.34.180(1)(f), the trial court must consider "whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child." But it is clear that the trial court explicitly addressed this factor:

> 2.34 The father has not asked Ms. Tso, either directly or through family intermediaries, to arrange visits with [Z.R.] while he has been incarcerated, and has not asked the court to require visitation.
>
> . . . .
>
> 2.64 . . . [T]here was no evidence provided about limitations in [Dunbar's] access to visiting opportunities with Z.R., restrictions to telephone or mail services, delays or barriers [Dunbar] experienced in keeping the department apprised of his location and status, difficulty in accessing his lawyer, or participating meaningfully in court proceedings. On the contrary, evidence at trial established [Dunbar] did not

11

pursue visits with Z.R. and never filed any motions with the court to address his services or visitation with Z.R. [Dunbar] testified that he did not keep his attorney's contact information because he believed it was not necessary and that he would make all of his efforts at reunification through contacting the social worker.[11]

The trial court's finding was supported by substantial evidence. Dunbar never contacted the Department to request visitation, nor did he petition the court to order that Z.R. be brought to the jail to see him. This was consistent with Dunbar's conduct prior to his incarceration. Tso, the CASA, and the visitation supervisor all testified that it was very difficult to contact Dunbar to arrange visitation and that he frequently did not respond to their calls. Dunbar argued that he asked his wife to contact the Department on his behalf and arrange visits for him while he was in jail. But the trial court specifically found this testimony not credible:

> 2.62 [Dunbar] testified he granted his wife, Ms. Shire, power of attorney to act on his behalf. No exhibits were offered or produced by [Dunbar] to corroborate this claim. Ms. Shire also testified about being granted power of attorney, and she claimed to have made multiple unsuccessful efforts to contact Ms. Tso. Ms. Shire's testimony was not credible for a number of reasons: while being sworn in prior to testifying, Ms. Shire begrudgingly agreed to testify truthfully; she could not recall details; she was evasive when responding to questions; and she was openly hostile.

> 2.63 . . . Even if Ms. Shire and [Dunbar's] testimony was credible, which it was not, efforts were undertaken by Ms. Shire, not [Dunbar], and her efforts were not for the purpose of complying with services or repairing, maintaining, or building the parent-child relationship.[12]

---

[11] CP at 200, 204.
[12] CP at 189.

In determining whether substantial evidence supports the trial court's findings, this court does not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

Dunbar also contends that the lack of services in jail was a barrier to reunification and the trial court failed to consider this barrier. But the trial court did consider this argument and found it unpersuasive, noting that the lack of services was the result of Dunbar's own choices:

> 2.51 By his own choice, [Dunbar] did not participate in services prior to being incarcerated in the jail, and he has been unavailable to participate in services since he has been incarcerated. [Dunbar's] unavailability to participate in services is a direct consequence of his own choice to continue to engage in criminal acts, and the duration of his impending prison sentence renders services futile because no services could render him available to parent Z.R. in the child's near future.[13]

And the trial court also found that, even prior to his incarceration, Dunbar "was aware of the services he was required to comply with, but [had] an extremely poor attitude about the dependency proceeding and [was] dismissive of Z.R.'s special needs."[14] These findings were supported by substantial evidence.

*Meaningful Role*

Dunbar next contends the trial court failed to properly assess whether he maintained a meaningful role in Z.R.'s life. Again, it is clear that the trial court explicitly considered this factor:

> 2.59 [Dunbar] has not maintained a meaningful role in Z.R.'s life while incarcerated.

---

[13] CP at 188.
[14] CP at 187-88.

2.60 Except for asking the CASA, Ms. Elisabeth Yaroschuk, one time to tell Z.R. that he loved her, [Dunbar] has not made expressions or acts manifesting concerns for Z.R., such as letters, phone calls, visits, or other forms of communication with Z.R. In fact, by his own testimony, it is uncontroverted that while incarcerated [Dunbar] never communicated with Z.R. in any manner, nor did he request visits with her.

2.61 [Dunbar] testified he believes he maintained a relationship with Z.R. to the best of his abilities. This testimony is not credible and is not supported by any evidence. To the contrary, [Dunbar's] assertion is controverted by overwhelming evidence.[15]

These findings were supported by substantial evidence, including Dunbar's own admissions.

### RCW 13.34.145(5)(b) Factors

Finally, Dunbar argues that the trial court's findings regarding barriers to reunification and the role he played in Z.R.'s life were not informed by the six factors identified in RCW 13.34.145(5)(b). The record does not support this claim. For example, the trial court found that Dunbar had made no "expressions or acts manifesting concerns [sic]" for Z.R. because he had never attempted to contact her, nor did he contact the Department to ask how she was doing. The trial court also found that Dunbar "did not [make] efforts to communicate and work with the department."[16] The trial court found that there was no evidence that Dunbar was unable, by virtue of his incarceration, to contact the social

---

[15] CP at 189.
[16] CP at 189.

worker or his attorney or to participate in court hearings.[17] The trial court noted that, while Tso could have visited Dunbar more frequently at the jail, the Department's efforts overall were reasonable because no service would have addressed the fact of his lengthy incarceration. Finally, the trial court found that "[t]o the extent that [Dunbar] can be said to have had any significant involvement in the child's life up until this point, continued involvement of the father in Z.R.'s life is not in the child's best interest."[18] The trial court did not err in failing to consider the RCW 13.34.145(5)(b) factors.[19]

## Little Likelihood of Reunification

Dunbar argues that the trial court erred in finding that there was little likelihood that that Z.R. could be returned to him in the near future. He asserts that the trial court should have considered his amenability to treatment and commitment towards remedying his parental deficiencies.

The focus of RCW 13.34.180(1)(e) is whether a parent's identified deficiencies have been corrected. In re Dependency of D.L.B., 188 Wn. App. 905, 922, 355 P.3d 345 (2015). "Even where there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate where deficiencies will not be corrected within the foreseeable future." In re Welfare of A.G., 155 Wn. App. 578, 590, 229 P.3d 935 (2010).

---

[17] Two court hearings took place while Dunbar was incarcerated. He did not attend the first, which occurred only a few days after his arrest and before Dunbar's family members informed the Department where he was. He did attend the second via telephone. RP at 207, Ex. 12.

[18] CP at 190.

[19] Because the trial court in this case made specific written findings regarding its consideration of the incarcerated parents' factors, we need not address Dunbar's claim, raised for the first time in reply, that Civil Rule 52 compels a trial court to do so.

Although the law provides no numerical standard to measure the foreseeable future, this determination is a factual inquiry evaluated from "the child's point of view," which varies with the child's age. In re Dependency of A.C., 123 Wn. App. 244, 249, 98 P.3d 89 (2004).

Tso testified that the near future for Z.R. was three to six months. She estimated that even if Dunbar were released from jail immediately, it would take approximately a year to a year and a half for Dunbar to demonstrate that he understood Z.R.'s needs and could provide a safe, stable home for her. And Dunbar does not challenge the trial court's findings that "[d]ue to her needs [Z.R.] requires more attention from a caretaker than an average child" and "because of Z.R.'s significant special needs, she will need close monitoring and support."[20] Dunbar's history prior to incarceration suggested he was not motivated to learn about Z.R.'s special needs. And Dunbar was likely facing several years of incarceration. Under the circumstances, there was no likelihood that conditions would be remedied to permit Z.R.'s return in the near future.

We affirm the trial court's order terminating Dunbar's parental rights to Z.R.

Trickey, ACJ

WE CONCUR:

Appelwick, J.

Cox, J.

[20] CP at 185.

16